*719 Justice Scalia
announced the judgment of the Court and delivered an opinion, in which
The Chief Justice, Justice Thomas, and Justice Alito join.
In April 1989, petitioner John A. Rapanos backfilled wetlands on a parcel of land in Michigan that he owned and *720 sought to develop. This parcel included 54 acres of land with sometimes-saturated soil conditions. The nearest body of navigable water was 11 to 20 miles away. 339 F. 3d 447, 449 (CA6 2003) (Rapanos I). Regulators had informed Mr. Rapanos that his saturated fields were “waters of the United States,” 33 U. S. C. § 1362(7), that could not be filled *721 without a permit. Twelve years of criminal and civil litigation ensued.
The burden of federal regulation on those who would deposit fill material in locations denominated “waters of the United States” is not trivial. In deciding whether to grant or deny a permit, the U. S. Army Corps of Engineers (Corps) exercises the discretion of an enlightened despot, relying on such factors as “economics,” “aesthetics,” “recreation,” and “in general, the needs and welfare of the people,” 33 CFR § 320.4(a) (2004).[1] The average applicant for an individual permit spends 788 days and $271,596 in completing the process, and the average applicant for a nationwide permit spends 313 days and $28,915 — not counting costs of mitigation or design changes. Sunding & Zilberman, The Economies of Environmental Regulation by Licensing: An Assessment of Recent Changes to the Wetland Permitting Process, 42 Natural Resources J. 59, 74-76 (2002). “[0]ver $1.7 billion is spent each year by the private and public sectors obtaining wetlands permits.” Id., at 81. These costs cannot be avoided, because the Clean Water Act “impose[s] criminal liability,” as well as steep civil fines, “on a broad range of ordinary industrial and commercial activities.” Hanousek v. United States, 528 U. S. 1102, 1103 (2000) (THOMAS, J., dissenting from denial of certiorari). In this litigation, for example, for backfilling his own wet fields, Mr. Rapanos faced 63 months in prison and hundreds of thousands of dollars in criminal and civil fines. See United States v. Rapanos, 235 F. 3d 256, 260 (CA6 2000).
*722 The enforcement proceedings against Mr. Rápanos are a small part of the immense expansion of federal regulation of land use that has occurred under the Clean Water Act — without any change in the governing statute — during the past five Presidential administrations. In the last three decades, the Corps and the Environmental Protection Agency (EPA) have interpreted their jurisdiction over “the waters of the United States” to cover 270-to-300 million acres of swampy lands in the United States — including half of Alaska and an area the size of California in the lower 48 States. And that was just the beginning. The Corps has also asserted jurisdiction over virtually any parcel of land containing a channel or conduit — whether man-made or natural, broad or narrow, permanent or ephemeral — through which rainwater or drainage may occasionally or intermittently flow. On this view, the federally regulated “waters of the United States” include storm drains, roadside ditches, ripples of sand in the desert that may contain water once a year, and lands that are covered by floodwaters once every 100 years. Because they include the land containing storm sewers and desert washes, the statutory “waters of the United States” engulf entire cities and immense arid wastelands. In fact, the entire land area of the United States lies in some drainage basin, and an endless network of visible channels furrows the entire surface, containing water ephemerally wherever the rain falls. Any plot of land containing such a channel may potentially be regulated as a “water of the United States.”
I
Congress passed the Clean Water Act (CWA or Act) in 1972. The Act’s stated objective is “to restore and maintain the chemical, physical, and biological integrity of the Nation’s waters.” 86 Stat. 816, 33 U. S. C. § 1251(a). The Act also states that “[i]t is the policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan *723 the development and use (including restoration, preservation, and enhancement) of land and water resources, and to consult with the Administrator in the exercise of his authority under this chapter.” § 1251(b).
One of the statute’s principal provisions is 33 U. S. C. § 1311(a), which provides that “the discharge of any pollutant by any person shall be unlawful.” “The discharge of a pollutant” is defined broadly to include “any addition of any pollutant to navigable waters from any point source,” § 1362(12), and “pollutant” is defined broadly to include not only traditional contaminants but also solids such as “dredged spoil,... rock, sand, [and] cellar dirt,” § 1362(6). And, most relevant here, the CWA defines “navigable waters” as “the waters of the United States, including the territorial seas.” § 1362(7).
The Act also provides certain exceptions to its prohibition of “the discharge of any pollutant by any person.” § 1311(a). Section 1342(a) authorizes the Administrator of the EPA to “issue a permit for the discharge of any pollutant, . . . notwithstanding section 1311(a) of this title.” Section 1344 authorizes the Secretary of the Army, acting through the Corps, to “issue permits ... for the discharge of dredged or fill material into the navigable waters at specified disposal sites.” § 1344(a), (d). It is the discharge of “dredged or fill material” — which, unlike traditional water pollutants, are solids that do not readily wash downstream — that we consider today.
For a century prior to the CWA, we had interpreted the phrase “navigable waters of the United States” in the Act’s predecessor statutes to refer to interstate waters that are “navigable in fact” or readily susceptible of being rendered so. The Daniel Ball, 10 Wall. 557, 563 (1871); see also United States v. Appalachian Elec. Power Co., 311 U. S. 377, 406 (1940). After passage of the CWA, the Corps initially adopted this traditional judicial definition for the Act’s term “navigable waters.” See 39 Fed. Reg. 12119, codified at 33 CFR § 209.120(d)(1) (1974); see also Solid Waste Agency of *724 Northern Cook Cty. v. Army Corps of Engineers, 531 U. S. 159, 168 (2001) (SWANCC). After a District Court enjoined these regulations as too narrow, Natural Resources Defense Council, Inc. v. Callaway, 392 F. Supp. 685, 686 (DC 1975), the Corps adopted a far broader definition. See 40 Fed. Reg. 31324-31325 (1975); 42 Fed. Reg. 37144 (1977). The Corps’ new regulations deliberately sought to extend the definition of “the waters of the United States” to the outer limits of Congress’s commerce power. See id., at 37144, n. 2.
The Corps’ current regulations interpret “the waters of the United States” to include, in addition to traditional interstate navigable waters, 33 CFR § 328.3(a)(1) (2004), “[a]ll interstate waters including interstate wetlands,” § 328.3(a)(2); “[a]ll other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds, the use, degradation or destruction of which could affect interstate or foreign commerce,” § 328.3(a)(3); “[tributaries of [such] waters,” § 328.3(a)(5); and “[w]etlands adjacent to [such] waters [and tributaries] (other than waters that are themselves wetlands),” § 328.3(a)(7). The regulation defines “adjacent” wetlands as those “bordering, contiguous [to], or neighboring” waters of the United States. § 328.3(c). It specifically provides that “[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like are 'adjacent wetlands.’” Ibid.
We first addressed the proper interpretation of 33 U. S. C. §1362(7)’s phrase “the waters of the United States” in United States v. Riverside Bayview Homes, Inc., 474 U. S. 121 (1985). That case concerned a wetland that “was adjacent to a body of navigable water,” because “the area characterized by saturated soil conditions and wetland vegetation extended beyond the boundary of respondent’s property to ... a navigable waterway.” Id., at 131; see also 33 CFR § 328.3(b). Noting that “the transition from water to solid *725 ground is not necessarily or even typically an abrupt one,” and that “the Corps must necessarily choose some point at which water ends and land begins,” 474 U. S., at 132, we upheld the Corps’ interpretation of “the waters of the United States” to include wetlands that “actually abut[ted] on” traditional navigable waters. Id., at 135.
Following our decision in Riverside Bayview, the Corps adopted increasingly broad interpretations of its own regulations under the Act. For example, in 1986, to “clarify” the reach of its jurisdiction, the Corps announced the so-called “Migratory Bird Rule,” which purported to extend its jurisdiction to any intrastate waters “[wjhich are or would be used as habitat” by migratory birds. 51 Fed. Reg. 41217; see also SWANCC, supra, at 163-164. In addition, the Corps interpreted its own regulations to include “ephemeral streams” and “drainage ditches” as “tributaries” that are part of the “waters of the United States,” see 33 CFR § 328.3(a)(5), provided that they have a perceptible “ordinary high water mark” as defined in § 328.3(e). 65 Fed. Reg. 12823 (2000). This interpretation extended “the waters of the United States” to virtually any land feature over which rainwater or drainage passes and leaves a visible mark— even if only “the presence of litter and debris.” 33 CFR § 328.3(e). See also U. S. General Accounting Office, Report to the Chairman, Subcommittee on Energy Policy, Natural Resources and Regulating Affairs, Committee on Government Reform, House of Representatives, Waters and Wetlands: Corps of Engineers Needs to Evaluate Its District Office Practices in Determining Jurisdiction, GAO-04-297, pp. 20-22 (Feb. 2004) (hereinafter GAO Report), http:// www.gao.gov/new.items/d04297.pdf (all Internet materials as visited June 9, 2006, and available in Clerk of Court’s case file). Prior to our decision in SWANCC, lower courts upheld the application of this expansive definition of “tributaries” to such entities as storm sewers that contained flow to covered waters during heavy rainfall, United States v. Eidson, 108 *726 F. 3d 1336, 1340-1342 (CA11 1997), and dry arroyos connected to remote waters through the flow of groundwater over “centuries,” Quivira Mining Co. v. EPA, 765 F. 2d 126, 129 (CA10 1985).
In SWANCC, we considered the application of the Corps’ “Migratory Bird Rule” to “an abandoned sand and gravel pit in northern Illinois.” 531 U. S., at 162. Observing that “[i]t was the significant nexus between the wetlands and ‘navigable waters’ that informed our reading of the CWA in Riverside Bayview,” id., at 167 (emphasis added), we held that Riverside Bayview did not establish “that the jurisdiction of the Corps extends to ponds that are not adjacent to open water,” 531 U. S., at 168 (emphasis deleted). On the contrary, we held that “nonnavigable, isolated, intrastate waters,” id., at 171 — which, unlike the wetlands at issue in Riverside Bayview, did not “actually abu[t] on a navigable waterway,” 531 U. S., at 167 — were not included as “waters of the United States.”
Following our decision in SWANCC, the Corps did not significantly revise its theory of federal jurisdiction under § 1344(a). The Corps provided notice of a proposed rule-making in light of SWANCC, 68 Fed. Reg. 1991 (2003), but ultimately did not amend its published regulations. Because SWANCC did not directly address tributaries, the Corps notified its field staff that they “should continue to assert jurisdiction over traditional navigable waters . . . and, generally speaking, their tributary systems (and adjacent wetlands).” 68 Fed. Reg. 1998. In addition, because SWANCC did not overrule Riverside Bayview, the Corps continues to assert jurisdiction over waters “ ‘neighboring’ ” traditional navigable waters and their tributaries. 68 Fed. Reg. 1997 (quoting 33 CFR § 328.3(c) (2002)).
Even after SWANCC, the lower courts have continued to uphold the Corps’ sweeping assertions of jurisdiction over ephemeral channels and drains as “tributaries.” For example, courts have held that jurisdictional “tributaries” include *727 the “intermittent flow of surface water through approximately 2.4 miles of natural streams and manmade ditches (paralleling and crossing under 1-64),” Treacy v. Newdunn Assoc., 344 F. 3d 407, 410 (CA4 2003); a “roadside ditch” whose water took “a winding, thirty-two-mile path to the Chesapeake Bay,” United States v. Deaton, 332 F. 3d 698, 702 (CA4 2003); irrigation ditches and drains that intermittently connect to covered waters, Community Assn. for Restoration of Environment v. Henry Bosma Dairy, 305 F. 3d 943, 954-955 (CA9 2002); Headwaters, Inc. v. Talent Irrigation Dist., 243 F. 3d 526, 534 (CA9 2001); and (most implausibly of all) the “washes and arroyos” of an “arid development site,” located in the middle of the desert, through which “water courses . . . during periods of heavy rain,” Save Our Sonoran, Inc. v. Flowers, 408 F. 3d 1113, 1118 (CA9 2005).[2]
These judicial constructions of “tributaries” are not outliers. Rather, they reflect the breadth of the Corps’ determinations in the field. The Corps’ enforcement practices vary somewhat from district to district because “the definitions used to make jurisdictional determinations” are deliberately left “vague.” GAO Report 26; see also id., at 22. But district offices of the Corps have treated, as “waters of the United States,” such typically dry land features as “arroyos, coulees, and washes,” as well as other “channels that might have little water flow in a given year.” Id., at 20-21. They have also applied that definition to such man-made, intermit *728 tently flowing features as “drain tiles, storm drains systems, and culverts.” Id., at 24 (footnote omitted).
In addition to “tributaries,” the Corps and the lower courts have also continued to define “adjacent” wetlands broadly after SWANCC. For example, some of the Corps’ district offices have concluded, that wetlands are “adjacent” to covered waters if they are hydrologically connected “through directional sheet flow during storm events,” GAO Report 18, or if they lie within the “100-year floodplain” of a body of water — that is, they are connected to the navigable water by flooding, on average, once every 100 years, id., at 17, and n. 16. Others have concluded that presence within 200 feet of a tributary automatically renders a wetland “adjacent” and jurisdictional. Id., at 19. And the Corps has successfully defended such theories of “adjacency” in the courts, even after SWANCC’s excision of “isolated” waters and wetlands from the Act’s coverage. One court has held since SWANCC that wetlands separated from flood control channels by 70-foot-wide berms, atop which ran maintenance roads, had a “significant nexus” to covered waters because, inter alia, they lay “within the 100 year floodplain of tidal waters.” Baccarat Fremont Developers, LLC v. Army Corps of Engineers, 425 F. 3d 1150, 1152, 1157 (CA9 2005). In one of the cases before us today, the Sixth Circuit held, in agreement with “[t]he majority of courts,” that “while a hydrological connection between the non-navigable and navigable waters is required, there is no ‘direct abutment’ requirement” under SWANCC for “‘adjacency.’” 376 F. 3d 629, 639 (2004) (Rapanos II). And even the most insubstantial hydrologic connection may be held to constitute a “significant nexus.” One court distinguished SWANCC on the ground that “a molecule of water residing in one of these pits or ponds [in SWANCC] could not mix with molecules from other bodies of water” — whereas, in the case before it, “water molecules currently present in the wetlands will inevitably flow towards and mix with water from connecting bod *729 ies,” and “[a] drop of rainwater landing in the Site is certain to intermingle with water from the [nearby river].” United States v. Rueth Development Co., 189 F. Supp. 2d 874, 877-878 (ND Ind. 2002).
II
In these consolidated cases, we consider whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute “waters of the United States” within the meaning of the Act. Petitioners in No. 04-1034, the Rápanos and their affiliated businesses, deposited fill material without a permit into wetlands on three sites near Midland, Michigan: the “Salzburg site,” the “Hines Road site,” and the “Pine River site.” The wetlands at the Salzburg site are connected to a man-made drain, which drains into Hoppler Creek, which flows into the Kawkawlin River, which empties into Saginaw Bay and Lake Huron. See Brief for United States in No. 04-1034, p. 11; 339 F. 3d, at 449. The wetlands at the Hines Road site are connected to something called the “Rose Drain,” which has a surface connection to the Tittabawassee River. App. to Pet. for Cert, in No. 04-1034, pp. A23, B20. And the wetlands at the Pine River site have a surface connection to the Pine River, which flows into Lake Huron. Id., at A23-A24, B26. It is not clear whether the connections between these wetlands and the nearby drains and ditches are continuous or intermittent, or whether the nearby drains and ditches contain continuous or merely occasional flows of water.
The United States brought civil enforcement proceedings against the Rapanos petitioners. The District Court found that the three described wetlands were “within federal jurisdiction” because they were “ 'adjacent to other waters of the United States,’ ” and held petitioners liable for violations of the CWA at those sites. Id., at B32-B35. On appeal, the United States Court of Appeals for the Sixth Circuit affirmed, holding that there was federal jurisdiction over the *730 wetlands at all three sites because “there were hydrological connections between all three sites and corresponding adjacent tributaries of navigable waters.” 376 F. 3d, at 643.
Petitioners in No. 04-1384, the Carabells, were denied a permit to deposit fill material in a wetland located on a triangular parcel of land about one mile from Lake St. Clair. A man-made drainage ditch runs along one side of the wetland, separated from it by a 4-foot-wide man-made berm. The berm is largely or entirely impermeable to water and blocks drainage from the wetland, though it may permit occasional overflow to the ditch. The ditch empties into another ditch or a drain, which connects to Auvase Creek, which empties into Lake St. Clair. See App. to Pet. for Cert, in No. 04-1384, pp. 2a-3a.
After exhausting administrative appeals, the Carabell petitioners filed suit in the District Court, challenging the exercise of federal regulatory jurisdiction over their site. The District Court ruled that there was federal jurisdiction because the wetland “is adjacent to neighboring tributaries of navigable waters and has a significant nexus to ‘waters of the United States.’” Id., at 49a. Again the Sixth Circuit affirmed, holding that the Carabell wetland was “adjacent” to navigable waters. 391 F. 3d 704, 708 (2004) (Carabell).
We granted certiorari and consolidated the cases, 546 U. S. 932 (2005), to decide whether these wetlands constitute “waters of the United States” under the Act, and if so, whether the Act is constitutional.
Ill
The Rapanos petitioners contend that the terms “navigable waters” and “waters of the United States” in the Act must be limited to the traditional definition of The Daniel Ball, which required that the “waters” be navigable in fact, or susceptible of being rendered so. See 10 Wall, at 563. But this definition cannot be applied wholesale to the CWA. The Act uses the phrase “navigable waters” as a defined term, and the definition is simply “the waters of the United *731 States.” 33 U. S. C. § 1362(7). Moreover, the Act provides, in certain circumstances, for the substitution of state for federal jurisdiction over “navigable waters ... other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce ... including wetlands adjacent thereto.” § 1344(g)(1) (emphasis added). This provision shows that the Act’s term “navigable waters” includes something more than traditional navigable waters. We have twice stated that the meaning of “navigable waters” in the Act is broader than the traditional understanding of that term, SWANCC, 531 U. S., at 167; Riverside Bayview, 474 U. S., at 133.[3] We have also emphasized, however, that the qualifier “navigable” is not devoid of significance, SWANCC, supra, at 172.
We need not decide the precise extent to which the qualifiers “navigable” and “of the United States” restrict the coverage of the Act. Whatever the scope of these qualifiers, the CWA authorizes federal jurisdiction only over “waters.” 33 U. S. C. § 1362(7). The only natural definition of the term “waters,” our prior and subsequent judicial constructions of it, clear evidence from other provisions of the statute, and this Court’s canons of construction all confirm that “the wa *732 ters of the United States” in § 1362(7) cannot bear the expansive meaning that the Corps would give it.
The Corps’ expansive approach might be arguable if the CWA defined “navigable waters” as “water of ±he United States.” But “the waters of the United States” is something else. The use of the definite article (“the”) and the plural number (“waters”) shows plainly that § 1362(7) does not refer to water in general. In this form, “the waters” refers more narrowly to water “[a]s found in streams and bodies forming geographical features such as oceans, rivers, [and] lakes,” or “the flowing or moving masses, as of waves or floods, making up such streams or bodies.” Webster’s New International Dictionary 2882 (2d ed. 1954) (hereinafter Webster’s Second).[4] On this definition, “the waters of the United States” include only relatively permanent, standing or flowing bodies of water.[5] The definition refers to water *733 as found in “streams,” “oceans,” “rivers,” “lakes,” and “bodies” of water “forming geographical features.” Ibid. All of these terms connote continuously present, fixed bodies of water, as opposed to ordinarily dry channels through which water occasionally or intermittently flows. Even the least substantial of the definition’s terms, namely, “streams,” connotes a continuous flow of water in a permanent channel— especially when used in company with other terms such as “rivers,” “lakes,” and “oceans.”[6] None of these terms encompasses transitory puddles or ephemeral flows of water.
The restriction of “the waters of the United States” to exclude channels containing merely intermittent or ephem *734 eral flow also accords with the commonsense understanding of the term. In applying the definition to “ephemeral streams,” “wet meadows,” storm sewers and culverts, “directional sheet flow during storm events,” drain tiles, man-made drainage ditches, and dry arroyos in the middle of the desert, the Corps has stretched the term “waters of the United States” beyond parody. The plain language of the statute simply does not authorize this “Land Is Waters” approach to federal jurisdiction.
In addition, the Act’s use of the traditional phrase “navigable waters” (the defined term) further confirms that it confers jurisdiction only over relatively permanent bodies of water. The Act adopted that traditional term from its predecessor statutes. See SWANCC, 531 U. S., at 180 (Stevens, J., dissenting). On the traditional understanding, “navigable waters” included only discrete bodies of water. For example, in The Daniel Ball, we used the terms “waters” and “rivers” interchangeably. 10 Wall., at 563. And in Appalachian Electric, we consistently referred to the “navigable waters” as “waterways.” 311 U. S., at 407-409. Plainly, because such “waters” had to be navigable in fact or susceptible of being rendered so, the term did not include ephemeral flows. As we noted in SWANCC, the traditional term “navigable waters” — even though defined as “the waters of the United States” — carries some of its original substance: “[I]t is one thing to give a word limited effect and quite another to give it no effect whatever.” 531 U. S., at 172. That limited effect includes, at bare minimum, the ordinary presence of water.
Our subsequent interpretation of the phrase “the waters of the United States” in the CWA likewise confirms this limitation of its scope. In Riverside Bayview, we stated that the phrase in the Act referred primarily to “rivers, streams, and other hydrographic features more conventionally identifiable as ‘waters’” than the wetlands adjacent to such fea *735 tures. 474 U. S., at 131 (emphasis added). We thus echoed the dictionary definition of “waters” as referring to “streams and bodies forming geographical features such as oceans, rivers, [and] lakes.” Webster’s Second 2882 (emphasis added). Though we upheld in that case the inclusion of wetlands abutting such a “hydrographic featur[e]” — principally due to the difficulty of drawing any clear boundary between the two, see 474 U. S., at 132; Part IV, infra — nowhere did we suggest that “the waters of the United States” should be expanded to include, in their own right, entities other than “hydrographic features more conventionally identifiable as ‘waters,’” id., at 131. Likewise, in both Riverside Bayview and SWANCC, we repeatedly described the “navigable waters” covered by the Act as “open water” and “open waters.” See Riverside Bayview, supra, at 132, and n. 8, 134; SWANCC, supra, at 167, 172. Under no rational interpretation are typically dry channels described as “open waters.”
Most significant of all, the CWA itself categorizes the channels and conduits that typicálly carry intermittent flows of water separately from “navigable waters,” by including them in the definition of “ ‘point source.’ ” The Act defines “ ‘point source’” as “any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.” 33 U. S. C. § 1362(14). It also defines “ ‘discharge of a pollutant’ ” as “any addition of any pollutant to navigable waters from any point source.” §1362(12)(A) (emphasis added). The definitions thus conceive of “point sources” and “navigable waters” as separate and distinct categories. The definition of “discharge” would make little sense if the two categories were significantly overlapping. The separate classification of “ditch[es], channels], and con *736 duit[s]” — which are terms ordinarily used to describe the watercourses through which intermittent waters typically flow — shows that these are, by and large, not “waters of the United States.”[7]
*737 Moreover, only the foregoing definition of “waters” is consistent with the CWA’s stated “policy of Congress to recognize, preserve, and protect the primary responsibilities and rights of the States to prevent, reduce, and eliminate pollution, [and] to plan the development and use (including restoration, preservation, and enhancement) of land and water resources . . . § 1251(b). This statement of policy was included in the Act as enacted in 1972, see 86 Stat. 816, prior to the addition of the optional state administration program in the 1977 amendments, see 91 Stat. 1601. Thus the policy plainly referred to something beyond the subsequently added state administration program of 33 U. S. C. § 1344(g)-(Z). But the expansive theory advanced by the Corps, rather than “preserving] the primary rights and responsibilities of the States,” would have brought virtually all “plan[ning of] the development and use ... of land and water resources” by the States under federal control. It is therefore an unlikely reading of the phrase “the waters of the United States.”[8]
Even if the phrase “the waters of the United States” were ambiguous as applied to intermittent flows, our own canons of construction would establish that the Corps’ interpretation of the statute is impermissible. As we noted in *738 SWANCC, the Government’s expansive interpretation would “result in a significant impingement of the States’ traditional and primary power over land and water use.” 531 U. S., at 174. Regulation of land use, as through the issuance of the development permits sought by petitioners in both of these cases, is a quintessential state and local power. See FERC v. Mississippi, 456 U. S. 742, 767-768, n. 30 (1982); Hess v. Port Authority Trans-Hudson Corporation, 513 U. S. 30, 44 (1994). The extensive federal jurisdiction urged by the Government would authorize the Corps to function as a de facto regulator of immense stretches of intrastate land — an authority the agency has shown its willingness to exercise with the scope of discretion that would befit a local zoning board. See 33 CFR § 320.4(a)(1) (2004). We ordinarily expect a “clear and manifest” statement from Congress to authorize an unprecedented intrusion into traditional state authority. See BFP v. Resolution Trust Corporation, 511 U. S. 531, 544 (1994). The phrase “the waters of the United States” hardly qualifies.
Likewise, just as we noted in SWANCC, the Corps’ interpretation stretches the outer limits of Congress’s commerce power and raises difficult questions about the ultimate scope of that power. See 531 U. S., at 173. (In developing the current regulations, the Corps consciously sought to extend its authority to the farthest reaches of the commerce power. See 42 Fed. Reg. 37127 (1977).) Even if the term “the waters of the United States” were ambiguous as applied to channels that sometimes host ephemeral flows of water (which it is not), we would expect a clearer statement from Congress to authorize an agency theory of jurisdiction that presses the envelope of constitutional validity. See Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U. S. 568, 575 (1988).[9]
*739 In sum, on its only plausible interpretation, the phrase “the waters of the United States” includes only those relatively permanent, standing or continuously flowing bodies of water “forming geographic features” that are described in ordinary parlance as “streams[,] . . . oceans, rivers, [and] lakes.” See Webster’s Second 2882. The phrase does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall. The Corps’ expansive interpretation of the “the waters of the United States” is thus not “based on a permissible construction of the statute.” Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 843 (1984).
IV
In Carabell, the Sixth Circuit held that the nearby ditch constituted a “tributary” and thus a “water of the United States” under 33 CFR § 328.3(a)(5). See 391 F. 3d, at 708-709. Likewise in Rapanos II, the Sixth Circuit held that the nearby ditches were “tributaries” under § 328.3(a)(5). 376 F. 3d, at 643. But Rapanos II also stated that, even if the ditches were not “waters of the United States,” the wetlands were “adjacent” to remote traditional navigable waters in virtue of the wetlands’ “hydrological connection” to them. See id., at 639-640. This statement reflects the practice of *740 the Corps’ district offices, which may “assert jurisdiction over a wetland without regulating the ditch connecting it to a water of the United States.” GAO Report 23. We therefore address in this Part whether a wetland may be considered “adjacent to” remote “waters of the United States,” because of a mere hydrologic connection to them.
In Riverside Bayview, we noted the textual difficulty in including “wetlands” as a subset of “waters”: “On a purely linguistic level, it may appear unreasonable to classify ‘lands,’ wet or otherwise, as ‘waters.’ ” 474 U. S., at 132. We acknowledged, however, that there was an inherent ambiguity in drawing the boundaries of any “waters”:
“[T]he Corps must necessarily choose some point at which water ends and land begins. Our common experience tells us that this is often no easy task: the transition from water to solid ground is not necessarily or even typically an abrupt one. Rather, between open waters and dry land may lie shallows, marshes, mudflats, swamps, bogs — in short, a huge array of areas that are not wholly aquatic but nevertheless fall far short of being dry land. Where on this continuum to find the limit of ‘waters’ is far from obvious.” Ibid.
Because of this inherent ambiguity, we deferred to the agency’s inclusion of wetlands “actually abut[ting]” traditional navigable waters: “Faced with such a problem of defining the bounds of its regulatory authority,” we held, the agency could reasonably conclude that a wetland that “adjoin[ed]” waters of the United States is itself a part of those waters. Id., at 132, 135, and n. 9. The difficulty of delineating the boundary between water and land was central to our reasoning in the case: “In view of the breadth of federal regulatory authority contemplated by the Act itself and the inherent difficulties of defining precise bounds to regulable waters, the Corps’ ecological judgment about the relationship between waters and their adjacent wetlands provides *741 an adequate basis for a legal judgment that adjacent wetlands may be defined as waters under the Act.” Id., at 134 (emphasis added).[10]
When we characterized the holding of Riverside Bayview in SWANCC, we referred to the close connection between waters and the wetlands that they gradually blend into: “It was the significant nexus between the wetlands and ‘navigable waters’ that informed our reading of the CWA in Riverside Bayview Homes.” 531 U. S., at 167 (emphasis added). In particular, SWANCC rejected the notion that the ecological considerations upon which the Corps relied in Riverside. Bayview — and upon which the dissent repeatedly relies today, see post, at 796, 797-798, 798-799, 800, 803, 806, 807, 809-810 — provided an independent basis for including entities like “wetlands” (or “ephemeral streams”) within the phrase “the waters of the United States.” SWANCC found such ecological considerations irrelevant to the question *742 whether physically isolated waters come within the Corps’ jurisdiction. It thus confirmed that Riverside Bayview rested upon the inherent ambiguity in defining where water ends and abutting (“adjacent”) wetlands begin, permitting the Corps’ reliance on ecological considerations only to resolve that ambiguity in favor of treating all abutting wetlands as waters. Isolated ponds were not “waters of the United States” in their own right, see 531 U. S., at 167, 171, and presented no boundary-drawing problem that would have justified the invocation of ecological factors to treat them as such.
Therefore, only those wetlands with a continuous surface connection to bodies that are “waters of the United States” in their own right, so that there is no clear demarcation between “waters” and wetlands, are “adjacent to” such waters and covered by the Act. Wetlands with only an intermittent, physically remote hydrologic connection to “waters of the United States” do not implicate the boundary-drawing problem of Riverside Bayview, and thus lack the necessary connection to covered waters that we described as a “significant nexus” in SWANCC. 531 U. S., at 167. Thus, establishing that wetlands such as those at the Rápanos and Carabell sites are covered by the Act requires two findings: first, that the adjacent channel contains a “wate[r] of the United States,” (i. e., a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the “water” ends and the “wetland” begins.
V
Respondents and their amici urge that such restrictions on the scope of “navigable waters” will frustrate enforcement against traditional water polluters under 33 U. S. C. §§ 1311 and 1342. Because the same definition of “navigable waters” applies to the entire statute, respondents contend that water polluters will be able to evade the permitting re *743 quirement of § 1342(a) simply by discharging their pollutants into noncovered intermittent watercourses that lie upstream of covered waters. See Tr. of Oral Arg. 74-75.
That is not so. Though we do not decide this issue, there is no reason to suppose that our construction today significantly affects the enforcement of § 1342, inasmuch as lower courts applying §1342 have not characterized intermittent channels as “waters of the United States.” The Act does not forbid the “addition of any pollutant directly to navigable waters from any point source,” but rather the “addition of any pollutant to navigable waters.” § 1362(12)(A) (emphasis added); § 1311(a). Thus, from the time of the CWA’s enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit “directly into” covered waters, but pass “through conveyances” in between. United States v. Velsicol Chemical Corp., 438 F. Supp. 945, 946-947 (WD Tenn. 1976) (a municipal sewer system separated the “point source” and covered navigable waters). See also Sierra Club v. El Paso Gold Mines, Inc., 421 F. 3d 1133, 1137, 1141 (CA10 2005) (2.5 miles of tunnel separated the “point source” and “navigable waters”).
In fact, many courts have held that such upstream, intermittently flowing channels themselves constitute “point sources” under the Act. The definition of “point source” includes “any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.” 33 U. S. C. § 1362(14). We have held that the Act “makes plain that a point source need not be the original source of the pollutant; it need only convey the pollutant to ‘navigable waters.’” South Fla. Water Management Dist. v. Miccosukee Tribe, 541 U. S. 95, 105 (2004). Cases holding the intervening channel to be a point source include United States v. Ortiz, 427 F. 3d 1278, 1281 (CA10 2005) (a storm drain that carried *744 flushed chemicals from a toilet to the Colorado River was a “point source”), and Dague v. Burlington, 935 F. 2d 1343, 1354-1355 (CA2 1991) (a culvert connecting two bodies of navigable water was a “point source”), rev’d on other grounds, 505 U. S. 557 (1992). Some courts have even adopted both the “indirect discharge” rationale and the “point source” rationale in the alternative, applied to the same facts. See, e. g., Concerned Area Residents for Environment v. Southview Farm, 34 F. 3d 114, 118-119 (CA2 1994). On either view, however, the lower courts have seen no need to classify the intervening conduits as “waters of the United States.”
In contrast to the pollutants normally covered by the permitting requirement of § 1342(a), “dredged or fill material,” which is typically deposited for the sole purpose of staying put, does not normally wash downstream,[11] and thus does not normally constitute an “addition ... to navigable waters” when deposited in upstream isolated wetlands. §§ 1344(a), *745 1362(12). The Act recognizes this distinction by providing a separate permitting program for such discharges in § 1344(a). It does not appear, therefore, that the interpretation we adopt today significantly reduces the scope of § 1342.
Respondents also urge that the narrower interpretation of “waters” will impose a more difficult burden of proof in enforcement proceedings under §§ 1311(a) and 1342(a), by requiring the agency to demonstrate the downstream flow of the pollutant along the intermittent channel to traditional “waters.” See Tr. of Oral Arg. 57. But, as noted above, the lower courts do not generally rely on characterization of intervening channels as “waters of the United States” in applying § 1311 to the traditional pollutants subject to § 1342. Moreover, the proof of downstream flow of pollutants required under § 1342 appears substantially similar, if not identical, to the proof of a hydrologic connection that would be required, on the Sixth Circuit’s theory of jurisdiction, to prove that an upstream channel or wetland is a “wate[r] of the United States.” See Rapanos II, 376 F. 3d, at 639. Compare, e. g., App. to Pet. for Cert, in No. 04-1034, at Bll, B20, B26 (testimony of hydrologic connections based on observation of surface water connections), with Southview Farm, supra, at 118-121 (testimony of discharges based on observation of the flow of polluted water). In either case, the agency must prove that the contaminant-laden waters ultimately reach covered waters.
Finally, respondents and many amici admonish that narrowing the definition of “the waters of the United States” will hamper federal efforts to preserve the Nation’s wetlands. It is not clear that the state and local conservation efforts that the CWA explicitly calls for, see 33 U. S. C. § 1251(b), are in any way inadequate for the goal of preservation. In any event, a Comprehensive National Wetlands Protection Act is not before us, and the “wis[dom]” of such a statute, post, at 805 (opinion of Stevens, J.), is beyond our *746 ken. What is clear, however, is that Congress did not enact one when it granted the Corps jurisdiction over only “the waters of the United States.”
VI
In an opinion long on praise of environmental protection and notably short on analysis of the statutory text and structure, the dissent would hold that “the waters of the United States” include any wetlands “adjacent” (no matter how broadly defined) to “tributaries” (again, no matter how broadly defined) of traditional navigable waters. For legal support of its policy-laden conclusion, the dissent relies exclusively on two sources: “[o]ur unanimous opinion in Riverside Bayview,” post, at 792; and “Congress’ deliberate acquiescence in the Corps’ regulations in 1977,” post, at 797. Each of these is demonstrably inadequate to support the apparently limitless scope that the dissent would permit the Corps to give to the Act.
A
The dissent’s assertion that Riverside Bayview “squarely controls these cases,” post, at 792, is wholly implausible. First, Riverside Bayview could not possibly support the dissent’s acceptance of the Corps’ inclusion of dry beds as “tributaries,” post, at 804, because the definition of tributaries was not at issue in that case. Riverside Bayview addressed only the Act’s inclusion of wetlands abutting navigable-in-fact waters, and said nothing at all about what nonnavigable tributaries the Act might also cover.
Riverside Bayview likewise provides no support for the dissent’s complacent acceptance of the Corps’ definition of “adjacent,” which (as noted above) has been extended beyond reason to include, inter alia, the 100-year floodplain of covered waters. See supra, at 728. The dissent notes that Riverside Bayview quoted without comment the Corps’ description of “adjacent” wetlands as those “ ‘that form the border of or are in reasonable proximity to other waters’... of *747 the United States.” Post, at 793 (citing 474 U. S., at 134 (quoting 42 Fed. Reg. 37128)). As we have already discussed, this quotation provides no support for the inclusion of physically unconnected wetlands as covered “waters.” See supra, at 741, n. 10. The dissent relies principally on a footnote in Riverside Bayview recognizing that “ ‘not every adjacent wetland is of great importance to the environment of adjoining bodies of water,’ ” and that all “ ‘adjacent’ ” wetlands are nevertheless covered by the Act, post, at 793 (quoting 474 U. S., at 135, n. 9). Of course, this footnote says nothing to support the dissent’s broad definition of “adjacent” — quite the contrary, the quoted sentence uses “adjacent” and “adjoining” interchangeably, and the footnote qualifies a sentence holding that the wetland was covered “fbjecause” it “actually abutfted] on a navigable waterway.” Id., at 135 (emphasis added). Moreover, that footnote’s assertion that the Act may be interpreted to include even those adjoining wetlands that are “lacking in importance to the aquatic environment,” id., at 135, n. 9, confirms that the scope of ambiguity of “the waters of the United States” is determined by a wetland’s physical connection to covered waters, not its ecological relationship thereto.
The dissent reasons (1) that Riverside Bayview held that “the waters of the United States” include “adjacent wetlands,” and (2) we must defer to the Corps’ interpretation of the ambiguous word “adjacent.” Post, at 805-806. But this is mere legerdemain. The phrase “adjacent wetlands” is not part of the statutory definition that the Corps is authorized to interpret, which refers only to “the waters of the United States,” 33 U. S. C. § 1362(7).[12] In expounding the *748 term “adjacent” as used in Riverside Bayview, we are explaining our own prior use of that word to interpret the definitional phrase “the waters of the United States.” However ambiguous the term may be in the abstract, as we have explained earlier, “adjacent” as used in Riverside Bayview is not ambiguous between “physically abutting” and merely “nearby.” See supra, at 740-742.
The dissent would distinguish SWANCC on the ground that it “had nothing to say about wetlands,” post, at 794— i. e., it concerned “isolated ponds” rather than isolated wetlands. This is the ultimate distinction without a difference. If isolated “permanent and seasonal ponds of varying size ... and depth,” 531 U. S., at 163 — which, after all, might at least be described as “waters” in their own right — did not constitute “waters of the United States,” a fortiori, isolated swampy lands do not constitute “waters of the United States.” See also 474 U. S., at 132. As the author of today’s dissent has written, “[i]f, as I believe, actually navigable waters lie at the very heart of Congress’ commerce power and 'isolated,’ nonnavigable waters lie closer to . . . the margin, 'isolated wetlands,’ which are themselves only marginally 'waters,’ are the most marginal category of 'waters of the United States’ potentially covered by the statute.” 531 U. S., at 187, n. 13 (Stevens, J., dissenting).
The only other ground that the dissent offers to distinguish SWANCC is that, unlike the ponds in SWANCC, the wetlands in these cases are “adjacent to navigable bodies of water and their tributaries” — where “adjacent” may be interpreted who-knows-how broadly. It is not clear why roughly defined physical proximity should make such a difference — without actual abutment, it raises no boundary- *749 drawing ambiguity, and it is undoubtedly a poor proxy for ecological significance. In fact, though the dissent is careful to restrict its discussion to wetlands “adjacent” to tributaries, its reasons for including those wetlands are strictly ecological — such wetlands would be included because they “serve . . . important water quality roles,” post, at 796, and “play important roles in the watershed,” post, at 803. This reasoning would swiftly overwhelm SWANCC altogether; after all, the ponds at issue in SWANCC could, no less than the wetlands in these cases, “offer ‘nesting, spawning, rearing and resting sites for aquatic or land species,’” and “‘serve as valuable storage areas for storm and flood waters,’ ” post, at 796. The dissent’s exclusive focus on ecological factors, combined with its total deference to the Corps’ ecological judgments, would permit the Corps to regulate the entire country as “waters of the United States.”
B
Absent a plausible ground in our case law for its sweeping position, the dissent relies heavily on “Congress’ deliberate acquiescence in the Corps’ regulations in 1977,” post, at 797 — noting that “[w]e found [this acquiescence] significant in Riverside Bay view,” and even “acknowledged in SWANCC” that we had done so, ibid. SWANCC “acknowledged” that Riverside Bayview had relied on congressional acquiescence only to criticize that reliance. It reasserted in no uncertain terms our oft-expressed skepticism toward reading the tea leaves of congressional inaction:
“Although we have recognized congressional acquiescence to administrative interpretations of a statute in some situations, we have done so with extreme care. Failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute. . . . The relationship between the actions and inactions of the 95th Congress and the intent of the 92d Congress in passing [§ 1344(a)] is also considerably at *750 tenuated. Because subsequent history is less illuminating than the contemporaneous evidence, respondents face a difficult task in overcoming the plain text and import of [§ 1344(a)].” 531 U. S., at 169-170 (brackets, citations, internal quotation marks, and footnote omitted).
Congress takes no governmental áction except by legislation. What the dissent refers to as “Congress’ deliberate acquiescence” should more appropriately be called Congress’s failure to express any opinion. We have no idea whether the Members’ failure to act in 1977 was attributable to their belief that the Corps’ regulations were correct, or rather to their belief that the courts would eliminate any excesses, or indeed simply to their unwillingness to confront the environmental lobby. To be sure, we have sometimes relied on congressional acquiescence when there is evidence that Congress considered and rejected the “precise issue” presented before the Court, Bob Jones Univ. v. United States, 461 U. S. 574, 600 (1983) (emphasis added). However, “[a]bsent such overwhelming evidence of acquiescence, we are loath to replace the plain text and original understanding of a statute with an amended agency interpretation.” SWANCC, supra, at 169-170, n. 5 (emphasis added).
The dissent falls far short of producing “overwhelming evidence” that Congress considered and failed to act upon the “precise issue” before the Court today — namely, what constitutes an “adjacent” wetland covered by the Act. Citing Riverside Bayview’s account of the 1977 debates, the dissent claims nothing more than that Congress “conducted extensive debates about the Corps’ regulatory jurisdiction over wetlands [and] rejected efforts to limit that jurisdiction____” Post, at 797. In fact, even that vague description goes too far. As recounted in Riverside Bayview, the 1977 debates concerned a proposal to “limi[t] the Corps’ authority under [§ 1344] to waters navigable in fact and their adjacent wetlands (defined as wetlands periodically inundated by contiguous navigable waters),” 474 U. S., at 136. In rejecting this *751 proposal, Congress merely failed to enact a limitation of “waters” to include only navigable-in-fact waters — an interpretation we affirmatively reject today, see supra, at 731 — and a definition of wetlands based on “periodi[e] inundation]” that appears almost nowhere in the briefs or opinions of these cases.[13] No plausible interpretation of this legislative inaction can construe it as an implied endorsement of every jot and tittle of the Corps’ 1977 regulations. In fact, Riverside Bayview itself relied on this legislative inaction only as “at least some evidence of the reasonableness” of the agency’s inclusion of adjacent wetlands under the Act, 474 U. S., at 137, and for the observation that “even those who would have *752 restricted the reach of the Corps’ jurisdiction” would not have excised adjacent wetlands, ibid. Both of these conclusions are perfectly consistent with our interpretation, and neither illuminates the disputed question of what constitutes an “adjacent” wetland.
C
In a curious appeal to entrenched executive error, the dissent contends that “the appropriateness of the Corps’ 30-year implementation of the Clean Water Act should be addressed to Congress or the Corps rather than to the Judiciary.” Post, at 799; see also post, at 787-788, 807. Surely this is a novel principle of administrative law — a sort of 30-year adverse possession that insulates disregard of statutory text from judicial review. It deservedly has no precedent in our jurisprudence. We did not invoke such a principle in SWANCC, when we invalidated one aspect of the Corps’ implementation.
The dissent contends that “[bjecause there is ambiguity in the phrase ‘waters of the United States’ and because interpreting it broadly to cover such ditches and streams advances the purpose of the Act, the Corps’ approach should command our deference.” Post, at 804. Two defects in a single sentence: “[WJaters of the United States” is in some respects ambiguous. The scope of that ambiguity, however, does not conceivably extend to whether storm drains and dry ditches are “waters,” and hence does not support the Corps’ interpretation. And as for advancing “the purpose of the Act”: We have often criticized that last resort of extravagant interpretation, noting that no law pursues its purpose at all costs, and that the textual limitations upon a law’s scope are no less a part of its “purpose” than its substantive authorizations. See, e. g., Director, Office of Workers’ Compensation Programs v. Newport News Shipbuilding & Dry Dock Co., 514 U. S. 122, 135-136 (1995).
Finally, we could not agree more with the dissent’s statement, post, at 799, that “[wjhether the benefits of particular *753 conservation measures outweigh their costs is a classic question of public policy that should not be answered by appointed judges.” Neither, however, should it be answered by appointed officers of the Corps of Engineers in contradiction of congressional direction. It is the dissent’s opinion, and not ours, which appeals not to a reasonable interpretation of enacted text, but to the great environmental benefits that a patently unreasonable interpretation can achieve. We have begun our discussion by mentioning, to be sure, the high costs imposed by that interpretation — but they are in no way the basis for our decision, which rests, plainly and simply, upon the limited meaning that can be borne by the phrase “waters of the United States.”
VII
Justice Kennedy’s opinion concludes that our reading of the Act “is inconsistent with its text, structure, and purpose.” Post, at 776. His own opinion, however, leaves the Act’s “text” and “structure” virtually unaddressed, and rests its case upon an interpretation of the phrase “significant nexus,” ibid., which appears in one of our opinions.
To begin with, Justice Kennedy’s reading of “significant nexus” bears no easily recognizable relation to either the case that used it (SWANCC) or to the earlier case that that case purported to be interpreting (Riverside Bayview). . To establish a “significant nexus,” Justice Kennedy would require the Corps to “establish ... on a case-by-case basis” that wetlands adjacent to nonnavigable tributaries “significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as ‘navigable.’” Post, at 782, 780. This standard certainly does not come from Riverside Bayview, which explicitly rejected such case-by-case determinations of ecological significance for the jurisdictional question whether a wetland is covered, holding instead that all physically connected wetlands are covered. 474 U. S., at 135, n. 9. It is true enough that one *754 reason for accepting that physical-connection criterion was the likelihood that a physically connected wetland would have an ecological effect upon the adjacent waters. But case-by-case determination of ecological effect was not the test. Likewise, that test cannot be derived from SWANCC’s characterization of Riverside Bayview, which emphasized that the wetlands which possessed a “significant nexus” in that earlier case “actually abutted on a navigable waterway,” 531 U. S., at 167, and which specifically rejected the argument that physically unconnected ponds could be included based on their ecological connection to covered waters. In fact, Justice Kennedy acknowledges that neither Riverside Bayview nor SWANCC required, for wetlands abutting navigable-in-fact waters, the case-by-case ecological determination that he proposes for wetlands that neighbor non-navigable tributaries. See post, at 780. Thus, JUSTICE Kennedy misreads SWANCC’,s “significant nexus” statement as mischaracterizing Riverside Bayview to adopt a case-by-case test of ecological significance; and then transfers that standard to a context that Riverside Bayview expressly declined to address (namely, wetlands nearby non-navigable tributaries); while all the time conceding that this standard does not apply in the context that Riverside Bay-view did address (wetlands abutting navigable waterways). Truly, this is “turtles all the way down.”[14]
But misreading our prior decisions is not the principal problem. The principal problem is reading them in utter isolation from the text of the Act. One would think, after *755 reading Justice Kennedy’s exegesis, that, the crucial provision of the text of the CWA was a jurisdictional requirement of “significant nexus” between wetlands and navigable waters. In fact, however, that phrase appears nowhere in the Act, but is taken from SWANCC’s cryptic characterization of the holding of Riverside Bayview. Our interpretation of the phrase is both consistent with those opinions and compatible with what the Act does establish as the jurisdictional criterion: “waters of the United States.” Wetlands are “waters of the United States” if they bear the “significant nexus” of physical connection, which makes them as a practical matter indistinguishable from waters of the United States. What other nexus could conceivably cause them to be “waters of the United States”? Justice Kennedy’s test is that they, “either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as ‘navigable,’” post, at 780 (emphasis added). But what possible linguistic usage would accept that whatever (alone or in combination) affects waters of the United States is waters of the United States?
Only by ignoring the text of the statute and by assuming that the phrase of SWANCC (“significant nexus”) can properly be interpreted in isolation from that text does JUSTICE Kennedy reach the conclusion he has arrived at. Instead of limiting its meaning by reference to the text it was applying, he purports to do so by reference to what he calls the “purpose” of the statute. Its purpose is to clean up the waters of the United States, and therefore anything that might “significantly affect” the purity of those waters bears a “significant nexus” to those waters, and thus (he never says this, but the text of the statute demands that he mean it) is those waters. This is the familiar tactic of substituting the purpose of the statute for its text, freeing the Court to write a different statute that achieves the same purpose. To begin with, as we have discussed earlier, clean water is not the *756 only purpose of the statute. So is the preservation of primary state responsibility for ordinary land-use decisions. 33 U. S. C. § 1251(b). Justice Kennedy’s test takes no account of this purpose. More fundamentally, however, the test simply rewrites the statute, using for that purpose the gimmick of “significant nexus.” It would have been an easy matter for Congress to give the Corps jurisdiction over all wetlands (or, for that matter, all dry lands) that “significantly affect the chemical, physical, and biological integrity of” waters of the United States. It did not do that, but instead explicitly limited jurisdiction to “waters of the United States.”
Justice Kennedy’s disposition would disallow some of the Corps’ excesses, and in that respect is a more moderate flouting of statutory command than Justice Stevens’.[15] In another respect, however, it is more extreme. At least Justice Stevens can blame his implausible reading of the statute upon the Corps. His error consists of giving that agency more deference than reason permits. Justice Kennedy, however, has devised his new statute all on his own. It purports to be, not a grudging acceptance of an agency’s close-to-the-edge expansion of its own powers, but rather the *757 most reasonable interpretation of the law. It is far from that, unless whatever affects waters is waters.
VIII
Because the Sixth Circuit applied the wrong standard to determine if these wetlands are covered “waters of the United States,” and because of the paucity of the record in both of these cases, the lower courts should determine, in the first instance, whether the ditches or drains near each wetland are “waters” in the ordinary sense of containing a relatively permanent flow; and (if they are) whether the wetlands in question are “adjacent” to these “waters” in the sense of possessing a continuous surface connection that creates the boundary-drawing problem we addressed in Riverside Bayview.
* * *
We vacate the judgments of the Sixth Circuit in both No. 04-1034 and No. 04-1384, and remand both cases for further proceedings.

It is so ordered.

 In issuing permits, the Corps directs that “[a]ll factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economies, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.” § 320.4(a).

 We are indebted to the Sonoran court for a famous exchange, from the movie Casablanca (Warner Bros. 1942), which portrays most vividly the absurdity of finding the desert filled with waters:
“ ‘Captain Renault [Claude Rains]: “What in heaven’s name brought you to Casablanca?”
“‘Rick [Humphrey Bogart]: “My health. I came to Casablanca for the waters.”
“ ‘Captain Renault: “The waters? What waters? We’re in the desert.”
“ ‘Rick: “I was misinformed.” ’ ” 408 F. 3d, at 1117.

 One possibility, which we ultimately find unsatisfactory, is that the “other” waters covered by 33 U. S. C. § 1344(g)(1) are strictly intrastate waters that are traditionally navigable. But it would be unreasonable to interpret “the waters of the United States” to include all and only traditional navigable waters, both interstate and intrastate. This would preserve the traditional import of the qualifier “navigable” in the defined term “navigable waters,” at the cost of depriving the qualifier “of the United States” in the definition of all meaning. As traditionally understood, the latter qualifier excludes intrastate waters, whether navigable or not. See The Daniel Ball, 10 Wall. 557, 563 (1871). In SWANCC, we held that “navigable” retained something of its traditional import. 531 U. S., at 172. A fortiori, the phrase “of the United States” in the definition retains some of its traditional meaning.

 Justice Kennedy observes, post, at 770 (opinion concurring in judgment), that the dictionary approves an alternative, somewhat poetic usage of “waters” as connoting “[a] flood or inundation; as the waters have fallen. ‘The peril of waters, wind, and rocks.' Shak." Webster’s Second 2882. It seems to us wholly unreasonable to interpret the statute as regulating only “floods” and “inundations” rather than traditional waterways — and strange to suppose that Congress had waxed Shakespearean in the definition section of an otherwise prosaic, indeed downright tedious, statute. The duller and more commonplace meaning is obviously intended.

 By describing “waters” as “relatively permanent,” we do not necessarily exclude streams, rivers, or lakes that might dry up in extraordinary circumstances, such as drought. We also do not necessarily exclude seasonal rivers, which contain continuous flow during some months of the year but no flow during dry months — such as the 290-day, continuously flowing stream postulated by Justice Stevens’ dissent (hereinafter the dissent), post, at 800. Common sense and common usage distinguish between a wash and seasonal river.
Though scientifically precise distinctions between “perennial” and “intermittent” flows are no doubt available, see, e. g., Dept, of Interior, U. S. Geological Survey, E. Hedman & W. Osterkamp, Streamflow Characteristics Related to Channel Geometry of Streams in Western United States 15 (1982) (Water-Supply Paper 2193), we have no occasion in this litigation to decide exactly when the drying-up of a streambed is continuous and frequent enough to disqualify the channel as a “wate[r] of the United *733 States.” It suffices for present purposes that channels containing permanent flow are plainly within the definition, and that the dissent’s “intermittent” and “ephemeral” streams, post, at 801 — that is, streams whose flow is “[doming and going at intervals ... [b]roken, fitful,” Webster’s Second 1296, or “existing only, or no longer than, a day; diurnal. . . short-lived,” id., at 857 — are not.

 The principal definition of “stream” likewise includes reference to such permanent, geographically fixed bodies of water: “[a] current or course of water or other fluid, flowing on the earth, as a river, brook, etc.” Id., at 2493 (emphasis added). The other definitions of “stream” repeatedly emphasize the requirement of continuous flow: “[a] steady flow, as of water, air, gas, or the like”; “[a]nything issuing or moving with continued succession of parts”; “[a] continued current or course; current; drift.” Ibid, (emphasis added). The definition of the verb form of “stream” contains a similar emphasis on continuity: “[t]o issue or flow in a stream; to issue freely or move in a continuous flow or course.” Ibid, (emphasis added). On these definitions, therefore, the Corps’ phrases “intermittent streams,” 33 CFR §328.3(a)(3) (2004), and “ephemeral streams,” 65 Fed. Reg. 12823 (2000), are — like Senator Bentsen’s “ ‘flowing gullies,’ ” post, at 801, n. 11 (opinion of Stevens, J.) — useful oxymora. Properly speaking, such' entities constitute extant “streams” only while they are “continuously] ñow[ing]”; and the usually dry channels that contain them are never “streams.” Justice Kennedy apparently concedes that “an intermittent flow can constitute a stream” only “while it is flowing,” post, at 770 (emphasis added) — which would mean that the channel is a “water” covered by the Act only during those times when water flow actually occurs. But no one contends that federal jurisdiction appears and evaporates along with the water in such regularly dry channels.

 It is of course true, as the dissent and Justice Kennedy both observe, that ditches, channels, conduits and the like “can all hold water permanently as well as intermittently,” post, at 802 (opinion of Stevens, J.); see also post, at 771-772 (opinion of Kennedy, J.). But when they do, we usually refer to them as “rivers,” “creeks,” or “streams.” A permanently flooded ditch around a castle is technically a “ditch,” but (because it is permanently filled with water) we normally describe it as a “moat.” See Webster’s Second 1575. ■ And a permanently flooded man-made ditch used for navigation is normally described, not as a “ditch,” but as a “canal.” See id., at 388. Likewise, an open channel through which water permanently flows is ordinarily described as a “stream,” not as a “channel,” because of the continuous presence of water. This distinction is particularly apt in the context of a statute regulating water quality, rather than (for example) the shape of streambeds. Cf. Jennison v. Kirk, 98 U. S. 453, 454-456 (1879) (referring to man-made channels as “ditches” when the alleged injury arose from physical damage to the banks of the ditch); PUD No. 1 of Jefferson Cty. v. Washington Dept. of Ecology, 511 U. S. 700, 709 (1994) (referring to a water-filled tube as a “tunnel” in order to describe the shape of the conveyance, not the fact that it was water-filled), both cited post, at 802, n. 12 (opinion of Stevens, J.). On its only natural reading, such a statute that treats “waters” separately from “ditch[es], channel[s], tunnel[s], and eonduit[s],” thereby distinguishes between continuously flowing “waters” and channels containing only an occasional or intermittent flow.
It is also true that highly artificial, manufactured, enclosed conveyance systems — such as “sewage treatment plants,” post, at 772 (opinion of Kennedy, J.), and the “mains, pipes, hydrants, machinery, buildings, and other appurtenances and incidents” of the city of Knoxville’s “system of waterworks,” Knoxville Water Co. v. Knoxville, 200 U. S. 22, 27 (1906), cited post, at 802, n. 12 (opinion of Stevens, J.) — likely do not qualify as “waters of the United States,” despite the fact that they may contain continuous flows of water. See post, at 772 (opinion of Kennedy, J.); post, at 802, n. 12 (opinion of Stevens, J.). But this does not contradict our interpretation, which asserts that relatively continuous flow is a necessary condition for qualification as a “water,” not an adequate condition. Just as ordinary usage does not treat typically dry beds as “waters,” so also it *737 does not treat such elaborate, man-made, enclosed systems as “waters” on a par with “streams,” “rivers,” and “oceans.”

 Justice Kennedy contends that the Corps’ preservation of the “responsibilities and rights” of the States is adequately demonstrated by the fact that “33 States plus the District of Columbia have filed an amici brief in this litigation” in favor of the Corps’ interpretation, post, at 777. But it makes no difference to the statute’s stated purpose of preserving States’ “responsibilities and rights,” § 1251(b), that some States wish to unburden themselves of them. Legislative and executive officers of the States may be content to leave “responsibility]” with the Corps because it is attractive to shift to another entity controversial decisions disputed between politically powerful, rival interests. That, however, is not what the statute provides.

 Justice Kennedy objects that our reliance on these two dear-statement rules is inappropriate because “the plurality’s interpretation does not fit the avoidance concerns that it raises,” post, at 776 — that is, *739 because our resolution both eliminates some jurisdiction that is clearly constitutional and traditionally federal, and retains some that is questionably constitutional and traditionally local. But a elear-statement rule can carry one only so far as the statutory text permits. Our resolution, unlike Justice Kennedy’s, keeps both the overinclusion and the underinelusion to the minimum consistent with the statutory text. Justice Kennedy’s reading — despite disregarding the text — fares no better than ours as a precise “fit” for the “avoidance concerns” that he also acknowledges. He admits, post, at 782, that “the significant-nexus requirement may not align perfectly with the traditional extent of federal authority” over navigable waters — an admission that “tests the limits of understatement,” Gonzales v. Oregon, 546 U. S. 243, 286 (2006) (Scalia, J., dissenting) — and it aligns even worse with the preservation of traditional state land-use regulation.

 “Since the wetlands at issue in Riverside Bayview actually abutted waters of the United States, the case could not possibly have held that merely “neighboring” wetlands came within the Corps’ jurisdiction. Obiter approval of that proposition might be inferred, however, from the opinion’s quotation without comment of a statement by the Corps describing covered “adjacent” wetlands as those “ ‘that form the border of or are in reasonable proximity to other waters of the United States.’ ” 474 U. S., at 134 (quoting 42 Fed. Reg. 37128 (1977); emphasis added). The opinion immediately reiterated, however, that adjacent wetlands could be regarded as “the waters of the United States” in view of “the inherent difficulties of defining precise bounds to regulable waters,” 474 U. S., at 134 — a rationale that would have no application to physically separated “neighboring” wetlands. Given that the wetlands at issue in Riverside Bayview themselves “actually abut[ted] on a navigable waterway,” id., at 135; given that our opinion recognized that unconnected wetlands could not naturally be characterized as “ ‘waters’ ” at all, id., at 132; and given the repeated reference to the difficulty of determining where waters end and wetlands begin; the most natural reading of the opinion is that a wetlands’ mere “reasonable proximity” to waters of the United States is not enough to confer Corps jurisdiction. In any event, as discussed in our immediately following text, any possible ambiguity has been eliminated by SWANCC, 531 U. S. 159 (2001).

 The dissent argues that “the very existence of words like ‘alluvium’ and ‘silt’ in our language suggests that at least some [dredged or fill material] makes its way downstream,” post, at 807 (citation omitted). See also post, at 774-775 (opinion of Kennedy, J.). By contrast, amici cite multiple empirical analyses that contradict the dissent’s philological approach to sediment erosion — including one which concludes that “[t]he idea that the discharge of dredged or fill material into isolated waters, ephemeral drains or non-tidal ditches will pollute navigable waters located any appreciable distance from them lacks credibility.” R. Pierce, Technical Principles Related to Establishing the Limits of Jurisdiction for Section 404 of the Clean Water Act 34-40 (Apr. 2003), available at http://www.wetland training.com/tpreljscwa.pdf, cited in Brief for International Council of Shopping Centers et al. as Amici Curiae 26-27; Brief for Pulte Homes, Inc., et al. as Amici Curiae 20-21; Brief for Foundation for Environmental and Economic Progress et al. as Amici Curiae 29, and n. 53 (“Fill material does not migrate”). Such scientific analysis is entirely unnecessary, however, to reach the unremarkable conclusion that the deposit of mobile pollutants into upstream ephemeral channels is naturally described as an “addition ... to navigable waters,” 33 U. S. C. § 1362(12), while the deposit of stationary fill material generally is not.

 Nor does the passing reference to “wetlands adjacent thereto” in § 1344(g)(1) purport to expand that statutory definition. As the dissent concedes, post, at 805, that reference merely confirms that the statutory definition can be read to include some wetlands — namely, those that directly “abut” covered waters. Riverside Bayview explicitly acknowledged that § 1344(g)(1) “does not conclusively determine the construction *748 to be placed on the use of the term ‘waters’ elsewhere in the Act (particularly in [§1862(7)], which contains the relevant definition of ‘navigable waters’); however, ... it does at least suggest strongly that the term ‘waters’ as used in the Act does not necessarily exclude ‘wetlands.’ ” 474 U. S., at 138, n. 11 (emphasis added).

 The sole exception is in Justice Kennedy’s opinion, which argues that Riverside Bayview rejected our physical-connection requirement by accepting as a given that any wetland formed by inundation from covered waters (whether or not continuously connected to them) is covered by the Act: “The Court in Riverside Bayview ... did not suggest that a flood-based origin would not support jurisdiction; indeed, it presumed the opposite. See 474 U. S., at 134 (noting that the Corps’ view was valid ‘even for wetlands that are not the result of flooding or permeation’ (emphasis added)).” Post, at 773. Of course Justice Kennedy himself fails to observe this supposed presumption, since his “significant nexus” test makes no exception for wetlands created by inundation. In any event, the language from Riverside Bayview in Justice Kennedy’s parenthetical is wrenched out of context. The sentence which Justice Kennedy quotes in part immediately followed the Court’s conclusion that “adjacent” wetlands are included because of “the inherent difficulties of defining precise bounds to regulable waters,” 474 U. S., at 134. And the full sentence reads as follows: “This holds true even for wetlands that are not the result of flooding or permeation by water having its source in adjacent bodies of open water,” ibid, (emphasis added). Clearly, the “wetlands” referred to in the sentence are only “adjacent” wetlands — namely, those with the continuous physical connection that the rest of the Riverside Bayview opinion required, see supra, at 740-742. Thus, it is evident that the quoted language was not at all a rejection of the physical-connection requirement, but rather a rejection of the alternative position (which had been adopted by the lower court in that case, see 474 U. S., at 125) that the only covered wetlands are those created by inundation. As long as the wetland is “adjacent” to covered waters, said Riverside Bayview, its creation vel non by inundation is irrelevant.

 The allusion is to a classic story told in different forms and attributed to various authors. See, e. g., Geertz, Thick Description: Toward an Interpretive Theory of Culture, in The Interpretation of Cultures 28-29 (1973). In our favored version, an Eastern guru affirms that the earth is supported on the back of a tiger. When asked what supports the tiger, he says it stands upon an elephant; and when asked what supports the elephant he says it is a giant turtle. When asked, finally, what supports the giant turtle, he is briefly taken aback, but quickly replies “Ah, after that it is turtles all the way down.”

 It is unclear how much more moderate the flouting is, since Justice Kennedy’s “significant nexus” standard is perfectly opaque. When, exactly, does a wetland “significantly affect” covered waters, and when are its effects “in contrast . . . speculative or insubstantial”? Post, at 780. Justice Kennedy does not tell us clearly — except to suggest, post, at 782, that “ ‘ “isolated” is generally a matter of degree’ ” (quoting Leibowitz & Nadeau, Isolated Wetlands: State-of-the-Science and Future Directions, 23 Wetlands 663, 669 (2003)). As the dissent hopefully observes, post, at 808, such an unverifiable standard is not likely to constrain an agency whose disregard for the statutory language has been so long manifested. In fact, by stating that “[i]n both the consolidated eases before the Court the record contains evidence suggesting the possible existence of a significant nexus according to the principles outlined above,” post, at 783, Justice Kennedy tips a wink at the agency, inviting it to try its same expansive reading again.