PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-4295
_____

UNITED STATES OF AMERICA

v.

DAVID H. DONOVAN,
Appellant
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-96-cv-00484)
District Judge: Honorable Leonard P. Stark
_____

Argued on July 12, 2011

Before:  RENDELL, SMITH and FISHER, Circuit Judges.

(Opinion Filed:  October 31, 2011)

_____

Richard A. Barkasy, Esq.
Schnader Harrison Segal & Lewis
120 Fifth Avenue
2700 Fifth Avenue Place
Pittsburgh, PA  15222

Marieke T. Beck-Coon, Esq.
Stephen A. Fogdall, Esq.     **[ARGUED]**
Schnader Harrison Segal & Lewis
1600 Market Street, Suite 3600
Philadelphia, PA  19103
   *Counsel for Appellant*

Katherine J. Barton, Esq.     **[ARGUED]**
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, DC 20026

Patricia C. Hannigan, Esq.
Assistant U.S. Attorney
Office of United States Attorney
1007 North Orange Street, Suite 700
P.O. Box 2046
Wilmington, DE  19899

Kent E. Hanson, Esq.
United States Department of Justice
Environmental Defense Section
P.O. Box 23986
Washington, DC  20026
   *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

David H. Donovan added fill material to a portion of his property in New Castle County, Delaware that the United States contends is "wetlands" subject to the Clean Water Act ("CWA" or "Act"). The Government brought an enforcement proceeding against him under the Act to force him to remove the fill and pay a fine. Donovan argued that his property is not covered by the CWA. However, the District Court disagreed, granting summary judgment in the Government's favor and imposing a $250,000 fine. In this appeal, we are called upon to decide what test to apply in order to determine whether land is "wetlands" subject to the CWA after the Supreme Court's ruling in *Rapanos v. United States*, 547 U.S. 715 (2006). We join the Courts of Appeals for the First and Eighth Circuits in holding, as the District Court here did, that property is "wetlands" subject to the CWA if it meets either of the tests laid out in *Rapanos*. We hold, further, that summary judgment was properly granted and will affirm.

## I. Background

### A. Facts and Procedural Posture

Donovan has owned a four-acre parcel of land bordering Route 13 near Smyrna in New Castle County, Delaware since September 29, 1982. The land is situated within the watershed of the Sawmill Branch, which flows into

3

the Smyrna River, and then into the Delaware Estuary and on to the Delaware Bay. The Sawmill Branch becomes tidal approximately 2.5 miles from Donovan's property. In August 1987, the land was inspected by the United States Army Corps of Engineers ("Corps"). Following this inspection, the Corps categorized the property as wetlands, concluded that approximately ¾ of an acre had been recently filled by Donovan, and warned Donovan that federal law required him to obtain a permit should he wish to fill more than one acre of his property.

In early 1993, the Corps again inspected Donovan's land and found that he had continued to fill his property without a permit. In July 1993, the Corps sent a cease-and-desist notice to Donovan, ordering him to remove 0.771 acres of fill material, or to submit a pre-discharge notification. Donovan rebuffed this initial notice and the similar notices that followed. Donovan's emphatic response to the notices was that the Corps had no right to regulate the use of his land.

In 1996, the United States sued Donovan, alleging that he had violated the CWA, 33 U.S.C. § 1311(a). In March 2002, the United States District Court for the District of Delaware concluded that Donovan had violated the CWA. Donovan appealed, but we dismissed the appeal for lack of jurisdiction because the District Court's order was not then final. On December 21, 2006, the District Court entered a final judgment against Donovan, imposing a $250,000 fine and requiring him to remove 0.771 acres of fill from his land.

Donovan appealed the December 21, 2006 judgment, arguing that the CWA did not give the Corps jurisdiction over his land. On July 24, 2008, we appointed *amicus* to address

4

whether the Supreme Court's decision in *Rapanos v. United States*, 547 U.S. 715 (2006), would require remand in this case.[1]  The Government then filed a motion requesting that the case be remanded to the District Court so that a record could be developed on the issue of the Corps' jurisdiction over Donovan's land.  We granted that motion and remanded the case to the District Court on April 13, 2009.

On remand, the District Court referred the case to a Magistrate Judge for all pretrial matters.  On March 15, 2010, Donovan moved for judgment on the pleadings and the Government moved for summary judgment.  The Government submitted two expert reports: one from wetland scientist Edward M. Launay ("Launay report") and the other from scientists at the Stroud Water Research Center ("Stroud report").  Both reports were based on extensive analysis and testing of Donovan's property between June 2009 and November 2009.  Launay used a variety of methods to map stream channels on and around Donovan's property and to demonstrate that they were perennial.  The Stroud scientists examined the physical, chemical, and biological connections between the wetlands on Donovan's property and downstream waters of the Sawmill Branch.  The Stroud scientists analyzed, *inter alia*, the wetlands' hydrological connections to downstream waters, the wetlands' potential for filtering pollutants, and the wetlands' role in the aquatic ecosystem for fish and invertebrates.

---

[1] In *Rapanos*, the Supreme Court, in a 4-1-4 opinion that we discuss more fully below, described two new tests for determining whether property is "wetlands" covered by the CWA.  The issue as to which test controls is a matter of first impression in this Court, and one we take up in depth below.

Donovan did not present any expert evidence in support of his motion, relying instead on his own affidavit, in which he expressed familiarity with the pattern of water flow on his property and stated that "the amount of water flowing on my Property in a given period is completely dependent on the amount of rainfall in the area during that period" and "[t]he only source of water flow on my Property is rainwater run-off from the adjacent highway." JA 639. His affidavit claimed that "in periods of no rain" the channels on his property are "completely dry." JA 640. Donovan also claimed that "2009 and 2010 are the rainiest and wettest years that I can recall in the nearly 50 years I have lived in the Smyrna region" and that the channels on his property were "completely dry for significant periods" in 2008, including "the summer months." *Id.* Donovan also stated that "[i]n periods of heavy rainfall, when there is water flowing on my Property, the rainwater channels are clearly defined and easy to differentiate from the neighboring land." JA 641.

The Magistrate Judge recognized that the sole issue to be decided was whether the property on which Donovan placed fill material is subject to regulation under the CWA. The Magistrate Judge issued a Report and Recommendation ("R&R") on July 23, 2010, which recommended that the District Court deny Donovan's motion and grant summary judgment in favor of the Government. In the R&R, the Magistrate Judge concluded that wetlands are covered by the CWA if they meet either of the tests articulated by the Supreme Court in *Rapanos*. The Magistrate Judge then analyzed the Government's expert reports and noted that they "offered sufficient evidence to support a finding" that the first *Rapanos* test was met, JA 17, and that they "adequately

6

show[ed]" that the second *Rapanos* test was met, JA 22. The Magistrate Judge did not cite or credit Donovan's declaration. The Magistrate Judge also recommended that Donovan's motion for judgment on the pleadings be denied, stating that the Government had adequately pled a basis for asserting jurisdiction over Donovan's land.

Donovan objected wholesale to the R&R. On September 13, 2010, the District Court overruled Donovan's objections to the R&R, granted the Government's motion for summary judgment, and denied Donovan's motion for judgment on the pleadings. The District Court rejected Donovan's contention that the Magistrate Judge misapplied the legal standard for summary judgment, saying that "there is no genuine issue of material fact as to whether the wetlands are subject to CWA jurisdiction, and . . . [Donovan] failed to come forward with evidence to enable a jury to reasonably find for . . . him on that issue." JA 30. The District Court agreed with the Magistrate Judge that federal authority can be asserted over wetlands that meet either *Rapanos* test. As to the first *Rapanos* test (which we will call the "continuous surface connection test" or the "plurality's test"), the District Court concluded that the Government "propounded significant evidence" that the test was met, and that Donovan's declaration failed to create a genuine issue of material fact as to whether the test was satisfied. JA 33. The District Court was also "satisfied that the Government's evidence . . . establishes" that the second *Rapanos* test (which we will call the "significant nexus test" or "Justice Kennedy's test") was met and noted that Donovan had "largely relie[d] on arguments by counsel concerning alleged deficiencies with the Government's evidence, but put[] forth no evidence of his own." JA 35-36. The District Court concluded that Donovan

7

failed to come forward with specific facts showing a genuine issue for trial and granted the Government's motion for summary judgment. Finally, the District Court denied Donovan's motion for judgment on the pleadings, holding that the Government pled enough factual matter to plausibly suggest that Donovan's property is subject to the CWA.

On November 8, 2010, Donovan appealed, arguing that the District Court applied the wrong legal standard to determine whether the Corps had jurisdiction over Donovan's property and misapplied the summary judgment standard.

B. Legal Background

The CWA provides that "the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311(a). According to the statutory definition, "discharge of any pollutant" includes "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).[2] The CWA defines "navigable waters" as the "waters of the United States." 33 U.S.C. § 1362(7). The Corps has interpreted this to mean that its regulatory jurisdiction extends over, *inter alia*, traditional navigable

---

[2] The statute defines "pollutant" as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). Donovan does not argue that the filler material he used on his land does not qualify as a pollutant under the CWA.

waters, their tributaries, and wetlands which are adjacent to any of the above. 33 C.F.R. § 328.3(a).[3]

The Supreme Court first considered the CWA's applicability to wetlands in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). In that case, the Corps sought to enjoin a landowner from filling its property because the Corps deemed the property to be wetlands falling under the protection of the CWA. The Supreme Court held that the Corps' construction of the CWA as applying to wetlands adjacent to waterways covered by the Act[4] was reasonable and that the landowner could not fill its property without a permit from the Corps. *Id.* at 131-35.

---

[3] The Corps' regulations define wetlands as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b). The term "adjacent" is defined in the regulations as meaning "bordering, contiguous, or neighboring." 33 C.F.R. § 328.3(c). According to the regulations, "adjacent wetlands" include "[w]etlands separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." *Id.*

[4] The wetlands in *Riverside Bayview* were adjacent to a navigable-in-fact waterway. Such waterways are inarguably covered by the CWA. *See* 474 U.S. at 130-31.

9

The Supreme Court next addressed the scope of the CWA's coverage in *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159 (2001) ("*SWANCC*"). In *SWANCC*, the Corps asserted jurisdiction over "an abandoned sand and gravel pit in northern Illinois" based on 51 Fed. Reg. 41217, a regulation that purported to extend the Corps' jurisdiction to intrastate waters "which are or would be used as a habitat by" endangered species or birds that migrate across state lines. *See id.* at 162-64. The Court held that the term "navigable waters," as defined in the CWA, could not be interpreted to include "nonnavigable, isolated, intrastate waters" not adjacent to bodies of open water, such as the pit at issue. *Id.* at 171.

The Supreme Court's most recent exposition on the breadth of the Corps' jurisdiction under the CWA came in *Rapanos v. United States*, 547 U.S. 715 (2006). In *Rapanos,* a consolidation of two cases, the Court considered "whether four Michigan wetlands, which lie near ditches or man-made drains that eventually empty into traditional navigable waters, constitute 'waters of the United States' within the meaning of the Act." *Id.* at 729 (plurality opinion). The Court of Appeals for the Sixth Circuit had upheld the Corps' claim of jurisdiction. The Supreme Court, in a fractured 4-1-4 decision, vacated those judgments and remanded for further proceedings to determine whether the wetlands were subject to the restrictions of the CWA.

Four dissenting Justices took an expansive view of the CWA's reach. Justice Stevens, writing for the dissenting Justices, stated that the Court should have deferred to what he and his fellow dissenting Justices viewed as the Corps'

reasonable interpretation of its jurisdiction. *Id.* at 796 (Stevens, J., dissenting). However, five Justices believed that the Corps' jurisdiction is more limited, although they did not all agree on the proper test to determine the scope of that jurisdiction.

Justice Scalia, writing for a four-Justice plurality, stated that the term "waters of the United States" as used in the CWA "includes only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic features' that are described in ordinary parlance as 'streams[,] . . . oceans, rivers, [and] lakes.'" *Id.* at 739 (alterations in original) (citing Webster's New International Dictionary 2882 (2d ed. 1954)). The plurality opinion noted that "the phrase ['the waters of the United States'] does not include channels through which water flows intermittently or ephemerally, or channels that periodically provide drainage for rainfall." *Id.* As for wetlands, the Justices in the plurality concluded that they only fall within the scope of the CWA if they have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.* at 742.

Justice Kennedy concurred. Although agreeing with the plurality's conclusion that the Corps' jurisdiction was more limited than the dissenters believed and that the case should be remanded, Justice Kennedy disagreed with the plurality's jurisdictional test. Under Justice Kennedy's approach, wetlands are subject to the strictures of the CWA if they possess a "significant nexus" with "waters of the United States," meaning that the wetlands, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological

11

integrity of other covered waters more readily understood as 'navigable.'" *Id.* at 779, 780 (Kennedy, J., concurring).

At first glance, the *Rapanos* opinions seem to present an analytical problem: the three opinions articulate three different views as to how courts should determine whether wetlands are subject to the CWA, and no opinion was joined by a majority of the Justices. So which test should apply? Interestingly, after explaining why he would have affirmed the judgments below, Justice Stevens noted that, "[i]t has been [the Supreme Court's] practice in a case coming to us from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate." *Id.* at 810 (Stevens, J., dissenting). That practice, he observed "has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views." *Id.* (citations omitted). Then, Justice Stevens stated that, although the Justices voting to remand disagreed about the appropriate test to be applied, the four dissenting Justices—with their broader view of the CWA's scope— would nonetheless support a finding of jurisdiction under *either* the plurality's *or* Justice Kennedy's test, and that therefore the Corps' jurisdiction should be upheld in all cases in which either test is satisfied. *Id.* at 810 & n.14.

## II. <u>Discussion</u>[5]

A.   <u>The Standard(s) for Establishing Federal Regulatory Jurisdiction Over Wetlands</u>

Following Justice Stevens's instruction, the District Court in the instant case examined both the *Rapanos* plurality's test and Justice Kennedy's test to determine whether the Corps has jurisdiction over Donovan's land and concluded that both tests were met, resulting in a finding of jurisdiction.  Donovan argues that this was error because the opinions in *Rapanos* fail to provide any governing standard, and therefore, under this Court's opinion in *Rappa v. New Castle County*, 18 F.3d 1043 (3d Cir. 1994), pre-*Rapanos* case law should govern whether Donovan's land is subject to the CWA.  We disagree.

While the Courts of Appeals are split on the proper interpretation of *Rapanos*, none has adopted Donovan's position.  The Courts of Appeals for the Seventh and Eleventh Circuits have concluded that Justice Kennedy's test alone creates the applicable standard for CWA jurisdiction over

---

[5] The District Court had jurisdiction to consider this Clean Water Act enforcement case pursuant to 28 U.S.C. §§ 1331, 1345, and 1355.  We have jurisdiction to review the District Court's conclusions pursuant to 28 U.S.C. § 1291.  We exercise plenary review over a district court's grant of summary judgment. *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 770 (3d Cir. 2009).  We review *de novo* a district court's denial of a motion for judgment on the pleadings. *DiCarlo v. St. Mary's Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008).

wetlands. *United States v. Gerke Excavating, Inc.*, 464 F.3d 723, 724-25 (7th Cir. 2006); *United States v. Robison*, 505 F.3d 1208, 1221-22 (11th Cir. 2007). These courts based their conclusions on an analysis of the Supreme Court's decision in *United States v. Marks*, in which the Court directed that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U.S. 188, 193 (1977) (citation and internal quotation marks omitted). In their view, Justice Kennedy's opinion in *Rapanos* controls because, among those Justices concurring in the judgment, Justice Kennedy's view is the least restrictive of federal jurisdiction. *Gerke*, 464 F.3d at 724-25; *Robison*, 505 F.3d at 1221-22.

The Courts of Appeals for the First and Eighth Circuits have taken a different view. These courts examined the Supreme Court's directive in *Marks*, but found that the *Rapanos* opinions did not lend themselves to a *Marks* analysis because neither the plurality opinion nor Justice Kennedy's opinion relied on "narrower" grounds than the other. *United States v. Johnson*, 467 F.3d 56, 62-64 (1st Cir. 2006); *United States v. Bailey*, 571 F.3d 791, 799 (8th Cir. 2009). Judge Lipez, writing for the majority of the panel in *Johnson*, disagreed that the "narrowest grounds" in the *Marks* sense necessarily means those grounds least restrictive of federal jurisdiction. The court in *Johnson* stated that "it seems just as plausible to conclude that the narrowest ground of decision in *Rapanos* is the ground *most* restrictive of government authority . . . because that ground avoids the constitutional issue of how far Congress can go in asserting jurisdiction

14

under the Commerce Clause." 467 F.3d at 63 (emphasis added). Even if one were to conclude that the opinion resting on the narrowest grounds is the one that relies on "less sweeping reasons than the other"—meaning that it requires the same outcome (here, the presence of federal regulatory jurisdiction) in only a subset of the cases that the other opinion would, and in no other cases—the court in *Johnson* concluded that *Marks* is unhelpful in determining which *Rapanos* test controls. *Id.* at 64. This is because Justice Kennedy's test would find federal jurisdiction in some cases that did not satisfy the plurality's test, and vice versa. *Id.* For example, if there is a small surface water connection between a wetland and a remote navigable water, the plurality would find jurisdiction, while Justice Kennedy might not. Furthermore, a wetland that lacks a surface connection with other waters, but significantly affects the chemical, physical, and biological integrity of a nearby river would meet Justice Kennedy's test but not the plurality's. *See id.* It is therefore difficult, if not impossible, to identify the "narrowest" approach.

Accordingly, the *Johnson* Court looked to Justice Stevens's approach in *Rapanos* and found it to provide "a simple and pragmatic way to assess what grounds would command a majority of the Court." *Id.* According to the *Johnson* Court, following Justice Stevens's instructions and looking to see if either *Rapanos* test is satisfied "ensures that lower courts will find jurisdiction in all cases where a majority of the Court would support such a finding." *Id.*[6]

---

[6] The *Johnson* Court also suggested that the Supreme Court has moved away from the *Marks* formulation, citing several instances in which "members of the Court have indicated that

Therefore, the Courts of Appeals for the First and Eighth Circuits held that federal regulatory jurisdiction can be established over wetlands that meet either the plurality's or Justice Kennedy's test from *Rapanos*. *Id.* at 66; *Bailey*, 571 F.3d at 799.[7]

We agree with the conclusion of the First Circuit Court of Appeals that neither the plurality's test nor Justice Kennedy's can be viewed as relying on narrower grounds than the other, and that, therefore, a strict application of

whenever a decision is fragmented such that no single opinion has the support of five Justices, lower courts should examine the plurality, concurring and dissenting opinions to extract the principles that a majority has embraced." 467 F.3d at 65-66 (citing cases). Moreover, the *Johnson* Court stated that "the fact that Justice Stevens does not even refer to *Marks* indicates that he found its framework inapplicable." *Id.* at 66.

[7] Several Circuit Courts of Appeals have expressly reserved the issue of which *Rapanos* test, or tests, governs CWA enforcement actions. *See Precon Dev. Corp. v. U.S. Army Corps of Eng'rs*, 633 F.3d 278, 288 (4th Cir. 2011) (reserving judgment on whether Corps jurisdiction can be established under either *Rapanos* test); *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 781 (9th Cir. 2011) (same); *United States v. Cundiff*, 555 F.3d 200, 210 (6th Cir. 2009) (declining to decide which *Rapanos* test or tests govern because jurisdiction was proper under both); *United States v. Lucas*, 516 F.3d 316, 325-27 (5th Cir. 2008) (upholding Corps jurisdiction over wetlands where evidence at trial supported jurisdiction under the reasoning of the plurality, Justice Kennedy, and Justice Stevens).

*Marks* is not a workable framework for determining the governing standard established by *Rapanos*. We also agree with its conclusion that each of the plurality's test and Justice Kennedy's test should be used to determine the Corps' jurisdiction under the CWA.

As we have stated in discussing *Marks*, our goal in analyzing a fractured Supreme Court decision is to find "a single legal standard . . . [that] when properly applied, produce[s] results with which a majority of the Justices in the case articulating the standard would agree." *Planned Parenthood of Southeastern Pa. v. Casey*, 947 F.2d 682, 693 (3d Cir. 1991), *modified on other grounds*, 505 U.S. 833 (1992). To that end, we have looked to the votes of dissenting Justices if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue. *See United States v. Richardson*, No. 11-1202, --- F.3d ----, 2011 WL 4430808, at *5 (3d Cir. Sept. 23, 2011) (viewing as "persuasive authority" the shared view of a four-Justice dissent and a single-Justice concurrence); *Horn v. Thoratec Corp.*, 376 F.3d 163, 176 & n.18 (3d Cir. 2004) ("Thus, on the state requirement issue, Justice Breyer joined with the four-member dissent to make a majority."); *Student Pub. Interest Research Grp. of N.J., Inc. v. AT&T Bell Labs.*, 842 F.2d 1436, 1451 (3d Cir. 1988) (deriving holding from one Justice concurrence and four dissenting Justices).

The Supreme Court has also employed this mode of analysis. In *United States v. Jacobsen*, 466 U.S. 109, 111 (1984), the Supreme Court determined that the rule of law established by its prior decision in *Walter v. United States*, 447 U.S. 649 (1980), could be divined by combining the opinion of the *Walter* Court (which garnered only two votes)

17

with the opinion of four dissenting Justices. Justice Stevens, writing for a majority of the Justices in *Jacobsen*, downplayed its reliance on the votes of the dissenting Justices in extrapolating a legal standard from *Walter*, saying that "the disagreement between the majority and the dissenters in [*Walter*] with respect to the [application of law to fact] is less significant than the agreement on the standard to be applied." *Jacobsen*, 466 U.S. at 117 n.12; s*ee also Vasquez v. Hillery*, 474 U.S. 254, 261 n.4 (1986) (describing as "unprecedented" the argument that "a statement of legal opinion joined by five Justices"—including some Justices in dissent—"does not carry the force of law"), *Alexander v. Choate*, 469 U.S. 287, 293 & nn. 8-9 (1985) (deriving holdings from opinion of the Court, concurring opinions, and dissenting opinions); *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 17 (1983) ("On remand, the Court of Appeals correctly recognized that the four dissenting Justices and Justice Blackmun formed a majority to require application of the *Colorado River* test.").

Thus, we are to examine the dissenting Justices' views to see if there is common ground. Here, there is more than just common ground. While our sister Courts of Appeals have struggled to divine the proper approach, we conclude that the struggle is greatly lessened because Justice Stevens, along with the other three Justices who joined his opinion, have actually told us what jurisdictional test is to be applied.

As we noted above, Justice Stevens specifically states:

I would affirm the judgments in both cases, and respectfully dissent from the decision of five Members of this Court to vacate and remand. I

18

close, however, by noting an unusual feature of the Court's judgments in these cases. It has been our practice in a case coming to us from a lower federal court to enter a judgment commanding that court to conduct any further proceedings pursuant to a specific mandate. That prior practice has, on occasion, made it necessary for Justices to join a judgment that did not conform to their own views. In these cases, however, while both the plurality and Justice Kennedy agree that there must be a remand for further proceedings, their respective opinions define different tests to be applied on remand. Given that all four Justices who have joined this opinion would uphold the Corps' jurisdiction in both of these cases—and in all other cases in which either the plurality's or Justice Kennedy's test is satisfied—on remand each of the judgments should be reinstated if either of those tests is met.

*Rapanos*, 547 U.S. at 810 (Stevens, J., dissenting) (footnotes omitted). And, lest there be any confusion, he adds, "in these and future cases the United States may elect to prove jurisdiction under either test." *Id.* at 810 n.14. Recognizing that the plurality and Justice Kennedy had failed to give a mandate to the Court of Appeals on remand, Justice Stevens and the dissenters provided the mandate. Were we to disregard this key aspect of his opinion we would be ignoring the directive of the dissenters. They have spoken and said that, while they would have chosen a broader test, they nonetheless agree that jurisdiction exists if either the plurality's or Justice Kennedy's test is met.

19

Accordingly, Donovan's invocation of our decision in *Rappa* is unavailing. In *Rappa*, we confronted a Supreme Court case in which the three opinions "share[d] no common denominator" and each failed to garner a majority of the Justices' votes. *Rappa*, 18 F.3d at 1060 (analyzing *Metromedia, Inc. v. San Diego*, 453 U.S. 490 (1981)). Faced with precedent in which there was no majority and no point of agreement whatsoever among the disparate opinions, we determined that the Supreme Court failed to establish a governing standard, and we therefore looked to prior case law to determine the relevant rule of law. *Id.* That is not the case here. Instead, in *Rapanos* there is a point of agreement and no basis for disregarding the Supreme Court's directive that two new tests should apply.[8] Because each of the tests for

---

[8] Because the four *Rapanos* dissenters explicitly endorsed both the plurality's and Justice Kennedy's jurisdictional tests, we are not faced with a concern, like in *Rappa*, that combining the votes of Justices who joined in different opinions would lead to unprincipled outcomes. *Rappa* noted that it would be possible to predict the outcome in any theoretical case involving a statute that discriminated among types of non-commercial speech and/or banned an entire means of communication. *Rappa*, 18 F.3d at 1060 n.24. That is, knowing that four Justices in *Metromedia* thought statutes discriminating among types of non-commercial speech are unconstitutional and that two Justices believed total bans on a particular medium are unconstitutional, one could surmise that a statute attempting to do both would be found unconstitutional by a majority of the *Metromedia* Justices, but that a statute purporting to do just one would survive a challenge. Such a system, the *Rappa* court noted, would

Corps jurisdiction laid out in *Rapanos* received the explicit endorsement of a majority of the Justices, *Rapanos* creates a governing standard for us to apply: the CWA is applicable to wetlands that meet either the test laid out by the plurality or by Justice Kennedy in *Rapanos*.

In any given case, this disjunctive standard will yield a result with which a majority of the *Rapanos* Justices would agree. *See Casey*, 947 F.2d at 693. If the wetlands have a continuous surface connection with "waters of the United States," the plurality and dissenting Justices would combine to uphold the Corps' jurisdiction over the land, whether or not the wetlands have a "substantial nexus" (as Justice Kennedy defined the term) with the covered waters. If the wetlands (either alone or in combination with similarly situated lands in the region) significantly affect the chemical, physical, and biological integrity of "waters of the United States," then Justice Kennedy would join the four dissenting Justices from *Rapanos* to conclude that the wetlands are covered by the CWA, regardless of whether the wetlands have a continuous

create the unprincipled outcome that "discriminat[ion] among types of non-commercial speech would be constitutional in and of itself, [but] would somehow be magically transformed into an unconstitutional statute if it also completely banned a means of communication." *Id.* *Rapanos* creates no such dilemma. We need not "combine" the votes of Justices relying on different rationales to find that a majority of the *Rapanos* Justices would come out a particular way in a given case. Two separate rationales *each independently* enjoy the support of five or more *Rapanos* Justices, without any need to "count[] the votes" of Justices relying on different rationales. *See id.*

surface connection with "waters of the United States." Finally, if neither of the tests is met, the plurality and Justice Kennedy would form a majority saying that the wetlands are not covered by the CWA.

In sum, we find that *Rapanos* establishes two governing standards and Donovan's reliance on pre-*Rapanos* case law is misplaced. We hold that federal jurisdiction to regulate wetlands under the CWA exists if the wetlands meet either the plurality's test or Justice Kennedy's test from *Rapanos*.

B. Application of the *Rapanos* tests to the Government's Motion for Summary Judgment

As we have now concluded that *either* standard in *Rapanos* can be utilized to establish the Corps' jurisdiction over wetlands, we must now determine whether the evidence before the District Court was sufficient for it to have granted summary judgment in favor of the Government under either test.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The initial burden is on the party seeking summary judgment to point to the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party carries this initial burden, "the nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial*" and do more than "simply show that there is some metaphysical doubt as

22

to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks omitted).  A party moving for summary judgment on an issue for which it bears the ultimate burden of proof faces a more difficult road in seeking summary judgment.  As we have said, "it is inappropriate to grant summary judgment in favor of a moving party who bears the burden of proof at trial unless a reasonable juror would be compelled to find its way on the facts needed to rule in its favor on the law." *El v. Se. Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007) (footnote omitted).  In such a case, "if there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact," summary judgment is inappropriate. *Id.*  All reasonable inferences should be drawn against the party moving for summary judgment.  *See Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986); *El*, 479 F.3d at 238.

The government met its initial burden on summary judgment of showing that Donovan's land was subject to the Corps' jurisdiction.  The Government submitted two reports prepared by its experts, Edward Launay and scientists from the Stroud Research Center.  These reports satisfy the Government's initial burden on summary judgment for both *Rapanos* tests.

First, the reports provide sufficient evidence that Donovan's wetlands meet the plurality's test to make out a *prima facie* case that the Government is entitled to summary judgment on the issue of the Government's jurisdiction.  *See Rapanos*, 547 U.S. at 742.  Both reports present facts showing that the channels on Donovan's land—which continue through the Sawmill Branch and on to the Smyrna River, both

23

navigable-in-fact waters—meet the plurality's definition of "relatively permanent." *See id.* at 732-33 (plurality opinion). In concluding that the streams are perennial in nature, the Launay report cites a "degree of soil saturation and surface ponding in wetlands during the summer months, morphological conditions of the vegetation such as buttressing of tree trunks and formation of hummocks, the presence and density of plant species adapted to saturated soil conditions, and the presence of bed, bank, ordinary watermark and flowing water in the tributary channels." JA 510. The Launay report also discusses downstream characteristics, including multiple large culverts, that reflect a perennial flow from the channels on Donovan's land. The Stroud report also concludes that the channels on Donovan's land are permanent based on the existence of several organisms in the wetlands and channels, as well as the presence of certain species of fish on the property.

Both reports also establish the second requirement of the plurality's test: that the wetlands have a "continuous surface connection" to a covered body of water. The Launay report tracks a continuous surface connection from Donovan's wetlands to the Smyrna River and documents the findings with fifty-eight photographs carrying explanatory captions. The Stroud report takes a different approach, utilizing a tracing chemical that shows a continuous surface connection. The test results show that chemical levels 2700 meters downstream were non-existent prior to the test, spiked, and dropped off precipitously thereafter, reflecting a water flow downstream from Donovan's property. Therefore, the Launay and Stroud reports satisfy the Government's initial burden on summary judgment with respect to the plurality's test.

As for Justice Kennedy's test for CWA coverage, the reports also satisfy the Government's initial Rule 56 burden of showing that there is no genuine dispute that Donovan's wetlands, "alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" 547 U.S. at 780 (Kennedy, J., concurring). The Stroud researchers added dissolved bromide and dye to the wetland complex intersecting Donovan's property and measured levels downstream, which indicate that the Donovan wetlands contribute flow to the Sawmill Branch. The Stroud report also finds that the headwater wetlands of the Sawmill Branch, which include Donovan's wetlands, help to remove nitrogen and protect the Delaware Estuary from excessive nutrient loading. The Stroud scientists conducted studies demonstrating that Donovan's wetlands help sequester pollutants such as zinc and polycyclic aromatic hydrocarbons (PAHs) from downstream waters. The Government's experts also conclude that the wetland complex that includes Donovan's land plays an important role in the "aquatic food web," by providing habitats and nutrients for fish species, as well as macroinvertebrates that support aquatic life in traditional navigable waters, and by supplying energy and nutrients to aquatic life in downstream navigable waters. The Launay report indicates that the gradient of the tributary stream channels on Donovan's land is low, meaning that the wetlands retain water for relatively long periods of time and perform important functions, such as reducing sediment loads and pollutants from storm water, as well as retaining and transforming nutrients for downstream navigable waters. Furthermore, the Launay report notes that the wetlands on and adjacent to Donovan's property

25

discharge ground water, thereby maintaining stream flow and preserving fish and wildlife habitats.

However, our analysis does not end here. Having determined that the Government met its *initial* burden under Rule 56, we must next analyze whether Donovan came forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586-87 (1986).[9]

The only evidence Donovan offers in opposition to the Government's motion for summary judgment is his four-page declaration. In that declaration, Donovan states that "the amount of water flowing on my Property in a given period is completely dependent on the amount of rainfall in the area during that period" and "[t]he only source of water flow on my Property is rainwater run-off from the adjacent highway." JA 639. Furthermore, he claims that "in periods of no rain" the channels on his property are "completely dry." JA 640. Donovan also says that "2009 and 2010 are the rainiest and wettest years that I can recall in the nearly 50 years I have lived in the Smyrna region" and that the channels on his

---

[9] Donovan argues that the Magistrate Judge and the District Court misapplied the summary judgment standard by placing the burden of proof on him to show that his land is *not* subject to the CWA. While some language from the R&R and the District Court's opinion, read in isolation, might suggest such a misapplication of Rule 56, we believe that the Magistrate Judge and District Court appropriately analyzed the second step of the summary judgment burden-shifting framework in finding that Donovan had offered no evidence rebutting the Government's *prima facie* showing that it was entitled to summary judgment.

property were "completely dry for significant periods" in 2008, including "the summer months." *Id.* Donovan's declaration also asserts that "[i]n periods of heavy rainfall, when there is water flowing on my Property, the rainwater channels are clearly defined and easy to differentiate from the neighboring land." JA 641. These statements all appear to be efforts to counter the Government's evidence that Donovan's wetlands fall within the *Rapanos* plurality's test. We need not, however, analyze whether Donovan has come forward with facts sufficient to raise a genuine issue about whether the *Rapanos* plurality's test is satisfied because he unquestionably has failed to raise a genuine issue about whether Justice Kennedy's test has been met.

Nothing in Donovan's affidavit speaks to the effect his wetlands have on the chemical, physical, and biological integrity of downstream waters. Donovan's only attempt to rebut the Government's showing in this regard is his argument that the Government's evidence is flawed, and that therefore a reasonable fact-finder could conclude that the Government failed to establish its regulatory jurisdiction over Donovan's land. Specifically, Donovan argues that the Government's experts exaggerate the purported effects that Donovan's wetlands have on navigable-in-fact waters by lumping Donovan's land with 761 acres of other wetlands in the Sawmill Branch watershed. He also attacks other portions of the Government's evidence, calling it uncertain and speculative, and claiming that it could fail to convince a reasonable fact-finder that the Corps has jurisdiction over Donovan's wetlands. However, even after drawing all reasonable inferences in Donovan's favor, we find that he has not shown a genuine issue for trial.

The unrebutted evidence in the record shows that Donovan's wetlands contribute water flow to the Sawmill Branch—which becomes tidal approximately 2.5 miles from Donovan's property—and help sequester pollutants such as zinc and PAHs from downstream waters. Specifically, the record evidence indicates that the intact wetland flow path on Donovan's property removes approximately 540 grams of zinc and 12 grams of PAH compounds over its 72-meter length, while a non-wetland flow path on the south of Donovan's property removes approximately 49 grams of zinc and 0.8 grams of PAHs over its 65-meter length. Absent Donovan's wetlands, these pollutants would travel downstream, raising contaminant levels for up to 150,000,000 gallons of water past EPA drinking water guidelines for decades or centuries to come. The record also shows that the Donovan wetlands are important sources of energy and carbon for downstream habitats. In addition, the Stroud scientists found fish on Donovan's property that were also found in downstream waters of Sawmill Branch Creek. Therefore, the record evidence shows that Donovan's wetlands *alone* significantly affect the chemical, physical, and biological integrity of "waters of the United States," without even considering the effect these wetlands have on such waters when aggregated with similarly situated lands in the region.[10]

---

[10] We do not purport to set out an exhaustive or exclusive list of considerations that support a finding of jurisdiction under Justice Kennedy's test. Nor do we address the question of what is meant by the words "or in combination with similarly situated lands" in Justice Kennedy's opinion. *See Rapanos*, 547 U.S. at 780 (Kennedy, J., concurring). We simply note that, standing alone, the evidence that Donovan's wetlands

28

Donovan points us to the Supreme Court's decision in *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620 (1944), and argues that summary judgment is inappropriate here because a reasonable jury would be free to disbelieve the opinions and conclusions of the Government's experts. *Sartor* is not controlling here because the *factual* evidence offered by the Government, and outlined above, is enough to meet its burden of production for a Rule 56 motion. Donovan offered no evidence to counter the Government's factual showing that Donovan's property significantly affects the chemical, physical, and biological integrity of navigable waters, nor did he raise sufficient doubt about the credibility of the Government's evidence to defeat summary judgment. *See Pelphrey v. United States*, 674 F.2d 243, 247 (4th Cir. 1982) (affirming summary judgment for government and distinguishing *Sartor* as dealing with "opinion evidence" when the moving party had submitted factual affidavits).

Faced with a motion for summary judgment citing record evidence supporting the Corps' jurisdiction, Donovan cannot rely simply on the mere possibility that a jury would find the Government's evidence insufficient. *See Matsushita*, 475 U.S. at 586; *cf. El*, 479 F.3d at 247 (affirming summary judgment for defendant on affirmative defense where nothing in the record rebutted defendant's expert evidence). There is no genuine issue as to the Corps' jurisdiction in this case and

---

significantly affect the chemical, physical, and biological integrity of other waters more readily understood as "navigable" satisfied the Government's burden on summary judgment and that Donovan has done nothing to rebut that showing so as to create a genuine issue for trial.

we will therefore affirm the District Court's order granting summary judgment to the Government.

C.  Donovan's Motion for Judgment on the Pleadings

Finally, Donovan challenges the District Court's denial of his motion for judgment on the pleadings. He alleges that the sole basis for the Corps' purported regulatory jurisdiction in this case is the claim that Donovan's wetlands are adjacent to a tributary of a navigable water. This allegation is derived from 33 C.F.R. § 328.3(a)(5), which states that any "tributary" of a water covered by the CWA is itself covered by the CWA, and 33 C.F.R. § 328.3(a)(7), which states that any "wetlands adjacent to [covered] waters" are themselves covered by the CWA. According to Donovan, this was the purported basis for the Corps' jurisdiction that the Supreme Court rejected in *Rapanos* and therefore a claim of jurisdiction invoking this standard fails on the pleadings.

The District Court correctly denied Donovan's motion. Donovan contends that the Corps has jurisdiction only over wetlands that are adjacent to navigable-in-fact waters and that the Government's pleadings fail for not alleging that Donovan's wetlands are adjacent to such waters. This argument is premised on a notion that we rejected above: that *Rapanos* fails to create a governing standard and that, therefore, pre-*Rapanos* law applies. The Government's complaint need not have pled that Donovan's wetlands are adjacent to navigable-in-fact waters and hence the District Court properly denied Donovan's motion for judgment on the pleadings.

30

## III. <u>Conclusion</u>

Accordingly, we will affirm the District Court's grant of summary judgment in favor of the Government and its denial of Donovan's motion for judgment on the pleadings.