**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1189-22

NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION and THE
COMMISSIONER OF THE
NEW JERSEY DEPARTMENT
OF ENVIRONMENTAL
PROTECTION,

     Plaintiffs-Appellants,

v.

HEXCEL CORPORATION and
FINE ORGANICS CORPORATION,

     Defendants-Respondents.

_____

Submitted February 13, 2024 – Decided April 19, 2024

Before Judges Gooden Brown and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1864-22.

Matthew J. Platkin, Attorney General, attorney for appellants (Donna Sue Arons, Assistant Attorney General, of counsel; Willis A. Doerr, Deputy Attorney General, on the briefs).

Richard B. Harper (Baker Botts LLP), Joshua B. Frank (Baker Botts LLP) of the District of Columbia bar, admitted pro hac vice, and Martha S. Thomsen (Baker Botts LLP) of the District of Columbia bar, admitted pro hac vice, attorneys for respondents (Richard B. Harper, Joshua B. Frank, and Martha S. Thomsen, on the brief).

PER CURIAM

Plaintiffs New Jersey Department of Environmental Protection and the Commissioner of the New Jersey Department of Environmental Protection (collectively, the DEP), appeal from the Law Division's August 19, 2022 order dismissing without prejudice the DEP's complaint against defendants Hexcel Corporation and Fine Organics Corporation. Because the trial court mistakenly found the complaint was barred by a prior consent judgment between the parties, we reverse and remand.

I.

In 1973, defendant Hexcel acquired a chemical manufacturing facility in Lodi (the site) where it conducted operations until 1986, when it sold the site to defendant Fine Organics. In 1998, Fine Organics sold the site back to Hexcel, after which no further operations occurred there.

The 1986 sale triggered remediation obligations under what became the Industrial Site Recovery Act (ISRA), N.J.S.A. 13:1k-6 to -14, stemming from

2

chemical use and fuel oil contamination at the site. To address remediation, Hexcel, Fine Organics and the DEP entered into an administrative consent order. In 2016, a licensed site remediation professional issued a response action outcome deeming remediation complete.

In 2005, the DEP sued Occidental Chemical Corporation and various other entities pursuant to the Spill Compensation and Control Act (the Spill Act), N.J.S.A. 58:10-23.11 to -23.24, the Water Pollution Control Act (WPCA), N.J.S.A. 58:10A-1 to -35, and common law, seeking past and future damages associated with the discharge of hazardous substances from a property in Newark that migrated throughout the Newark Bay Complex (the Passaic River Litigation). (N.J. Dep't of Env't Prot. v. Occidental Chem. Corp., No. ESX-L-9868-05 (N.J. Super. Law Div. 2005)). Defendants in that case filed third-party complaints against Hexcel, Fine Organics and over 200 other companies.

In 2013, the DEP entered into a consent judgment with Hexcel, Fine Organics and other third-party defendants, partially resolving the potential claims raised in that matter. Through the consent judgment, the parties settled liability for natural resource damages (NRD) of the Newark Bay Complex, subject to a cap/reopener not at issue in this appeal.

A-1189-22

In 2022, the DEP commenced this action against defendants asserting causes of action under the Spill Act, WPCA, strict liability, public nuisance, and trespass. The complaint alleged investigations prior to the 1986 sale of the site, as well as later investigations, "revealed widespread contamination of soil and groundwater and other natural resources at and around the [s]ite."

Count I alleged defendants discharged "hazardous substances at the [s]ite" under the Spill Act. Count II alleged defendants were strictly liable for contamination of the site's groundwater under the WPCA. Count III alleged defendants were strictly liable for contaminating the site's groundwater because defendants' activities were abnormally dangerous. Counts IV and V alleged the site's groundwater contamination constituted a public nuisance and trespass.

Defendants moved for dismissal, arguing the complaint was untimely under the applicable statute of limitations and barred by the consent judgment. The court agreed with defendants and dismissed the complaint without prejudice, finding the consent judgment barred the complaint. Because it decided the motion on those grounds, the court did not address the other arguments raised in defendants' motion, including whether the complaint was subject to dismissal based on statute of limitations grounds and for failure to plead with specificity.

4

On August 19, 2022, the court filed an order and written opinion. In its decision, the court noted DEP's counsel's statement at oral argument that it was not seeking damages related to offsite impacts but rather damages related to groundwater below the site was "in direct contrast with the allegations set forth in [the DEP's] complaint." The court found both the site's groundwater and offsite impacts were included in the scope of the consent judgment, and took "specific note" the consent judgment's definition of NRD "include[d] all of the causes of action set forth in [the DEP's] complaint . . . specifically[,] the Spill Act, the WPCA, state common law, and state statutory claims."

In addressing the consent judgment's reservation of rights with respect to "other actions," the court stated it was "uncontested that the [s]ite is located in the Newark Bay Complex." The court also found the consent judgment's definition of the Newark Bay Complex included "'adjacent waters' investigated as part of the Diamond Alkali Superfund Process." Relying on public Environmental Protection Agency (EPA) documents appended to defendants' motion, the court noted in the years following the consent judgment, "the EPA has made clear . . . that the areas investigated in the Diamond Alkali Superfund Site (and, by definition, the Newark Bay Complex) include not just the surface waterbodies and sediments, but the entire areal extent of the contamination and

A-1189-22

watershed area."  The court further noted the site and associated groundwater are included "upland sites."

The court found "[b]oth the Saddle River and the adjacent groundwater (including the groundwater at the [s]ite) were within the geographic scope of the Diamond Alkali Superfund Process investigation and specifically within the area studied around the Lower Passaic River."  Because the site was within the "areal extent of the contamination" investigated by the EPA in connection with the Diamond Alkali Superfund Process, the court determined it was part of the Newark Bay Complex.

The court found "the plain language of the [consent judgment] provides that the [s]ite, [s]ite groundwater, and any alleged off-site contamination are all part of the 'Newark Bay Complex' and [the] DEP's claims for NRD in this case are therefore barred by the [consent judgment]."

The court denied the DEP's subsequent motion to amend the order.  This appeal followed, wherein the DEP raises the following issues for our consideration:

> POINT I
>
> THE TRIAL COURT'S ORDER SHOULD BE REVERSED BECAUSE IT ERRONEOUSLY CONCLUDED THAT THE SITE'S GROUNDWATER IS AN "ADJACENT WATER."

6

POINT II

THE TRIAL COURT INCORRECTLY INTERPRETED AND APPLIED THE TERMS OF THE 2013 CONSENT JUDGMENT TO CONCLUDE THAT THE SITE WAS INVESTIGATED FOR REMEDIATION AS PART OF THE DIAMOND ALKALI SUPERFUND PROCESS AND FAILED TO PROVIDE THE STATE WITH THE BENEFIT OF ALL REASONABLE INFERENCES.

II.

In considering a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 4:6-2(e), the court assumes "allegations of the pleading are true and affords the pleader all reasonable factual inferences." Seidenberg v. Summit Bank, 348 N.J. Super. 243, 249-50 (App. Div. 2002). "This requires that the pleading be searched in depth and with liberality to determine whether a cause of action can be gleaned even from an obscure statement." Id. at 250. Courts must "proceed gingerly because Rule 4:6-2(e) motions to dismiss should be granted in 'only the rarest [of] instances.'" Banco Popular N. Am. v. Gandi, 184 N.J. 161, 165 (2005) (citations omitted). Our review of an order granting a motion to dismiss is governed by the same standard as applied by the trial court. Ibid.

A consent judgment is both a judicial decree and a contract—"it is not strictly a judicial decree, but rather in the nature of a contract entered into with

the solemn sanction of the court." Cmty. Realty Mgmt., Inc. for Wrightstown Arms Apartments v. Harris, 155 N.J. 212, 226 (1998) (quoting Stonehurst at Freehold v. Township Comm., 139 N.J. Super. 311, 313 (Law. Div. 1976)). Contract principles apply to a consent judgment, and it is treated as a quasi-contract. See ibid.

Generally, contract interpretation is subject to de novo review. Kieffer v. Best Buy, 205 N.J. 213, 222 (2011). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." Id. at 223. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). Courts enforce contracts based on the parties' intent, the underlying purpose of the contract, and the surrounding circumstances. Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J. 403, 415 (2016). "The judicial task is simply interpretative; it is not to rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer, 205 N.J. at 223. "The document must be read as a whole, in 'accord with justice and common sense.'" Cumberland Cnty. Imp. Auth. v. GSP Recycling Co., Inc., 358 N.J. Super. 484, 497 (App. Div. 2003) (quoting Krosnowski v. Krosnowski, 22 N.J. 376, 387 (1956)). Additionally, the contract "should not be interpreted to render one of its terms meaningless." Ibid.

8

"The court makes the determination whether a contractual term is clear or ambiguous." Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). A contract term is ambiguous when it is susceptible to more than one reasonable interpretation. Ibid.; see Powell v. Alemaz, Inc., 335 N.J. Super. 33, 44 (App. Div. 2000). The court should interpret contract terms "so as to avoid ambiguities, if the plain language of the contract permits." Stiefel v. Bayly, Martin and Fay of Conn., Inc., 242 N.J. Super. 643, 651 (App. Div. 1990).

When contractual terms are clear, "[courts] must enforce the contract as written," Graziano v. Grant, 326 N.J. Super. 328, 342 (App. Div. 1999), and courts are to interpret contracts "in accord with justice and common sense." Homann v. Torchinsky, 296 N.J. Super. 326, 334 (App. Div. 1997) (quoting Krosnowski, 22 N.J. at 387).

When contractual terms are ambiguous, however, courts "consider the parties' practical construction of the contract as evidence of their intention and as controlling weight in determining a contract's interpretation." Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020) (internal citations omitted).

Here, the "matters addressed" by the consent judgment included all liabilities of the third-party defendants associated with the discharge of hazardous substances into the Newark Bay Complex from third-party sites,

regardless of the location of the source of the discharge, whether inside or outside the Newark Bay Complex.

"Claims" included all claims of the DEP against defendants for discharges to the Newark Bay Complex or otherwise sought by the DEP from defendants in the Passaic River Litigation; all claims of the DEP for which third-party plaintiffs alleged or could have alleged that they were entitled to contribution from third-party defendants for discharge of hazardous substances to the Newark Bay Complex or otherwise sought by the third-party plaintiffs from third-party defendants in the Passaic River Litigation; and all claims for NRDs associated with settling third-party defendants' discharges of hazardous substances to the Newark Bay Complex.

NRDs were defined as:

> all claims arising from [d]ischarges at or to the Newark Bay Complex, known or unknown, that occurred prior to the effective date of this [c]onsent [j]udgment and that are recoverable by any New Jersey state natural resource trustee as damages for injuries to natural resources under the Spill Act; the WPCA; the Oil Pollution Act, 33 U.S.C.A. §§ 2701 through -2761; the Clean Water Act, 33 U.S.C.A. §§ 1251 through -1387; CERCLA,[1] or any other state or federal common law, statute, or regulation, for compensation for the restoration and/or replacement of, the lost value of,

---

[1] Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 to 9675.

injury to, or destruction of natural resources and natural resource services.

Although the DEP agreed not to sue for any future claims against any settling third-party defendant under State and federal statutory and common law, the consent judgment included one exception relevant to this appeal: the DEP was not precluded from bringing future claims related to the discharge of a hazardous substance "at, onto or from" a third-party site to the extent the claims were caused by discharge of hazardous substances not located in the Newark Bay Complex, that do not come to be located in the Newark Bay Complex.

The DEP argues the trial court erred in finding the site's groundwater was an adjacent water based on three different incorrect premises: 1) because the groundwater was investigated for remediation as part of the Diamond Alkali Superfund Process, based on the site's location in the geographic scope of the investigation; 2) based on an expanded definition contrary to the consent judgment; and 3) because it was located in the Passaic River Watershed.

The consent judgment defined the Newark Bay Complex as:

> (i) the lower [seventeen] miles of the Passaic River, (ii) Newark Bay, (iii) the Arthur Kill, (iv) the Kill Van Kull, (v) to the extent investigated for remediation as part of the Diamond Alkali Superfund Process, the lower reaches of the Hackensack River and as may be further extended by [the] EPA in the Diamond Alkali Superfund Process, and (vi) to the extent investigated

11

for remediation as part of the Diamond Alkali Superfund Process, any adjacent waters and sediments of (i) through (v).

Because the site's groundwater is not a body of water enumerated in (i) through (v), two criteria must be met for it to fall within the scope of the Newark Bay Complex: it must be adjacent to either the Passaic River, Newark Bay, Arthur Kill, Kill Van Kull, or the lower reaches of the Hackensack River; and must have been investigated for remediation as part of the Diamond Alkali Superfund Process. These are separate and distinct determinations.

The DEP acknowledges the consent judgment does not define "adjacent waters," but relies on 33 C.F.R. 328.3(c) and 40 C.F.R. 120.2(c)(2), both of which define adjacent as "having a continuous surface connection." The DEP asserts the term is "typically understood in the environmental context to mean 'bordering' or 'contiguous' waters."

The DEP also cites Rapanos v. U.S., which held that a "continuous surface connection," or instances of "no clear demarcation" between two water bodies would be sufficient to deem waters "adjacent" to one another, but "an intermittent, physically remote hydrological connection" is not. 547 U.S. 715, 742 (2006). As such, the DEP contends "adjacent water" does not refer to groundwater, and even if it did, the groundwater at the site has no direct

connection to the Passaic River, Newark Bay, Arthur Kill, Kill Van Kull, or the lower reaches of the Hackensack River.

In Rapanos, the plurality opinion determined wetlands are within the scope of the CWA only when they have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." Id. at 742. Justice Kennedy's concurring opinion stated wetlands are subject to the CWA if they shared a significant nexus with waters of the United States. Id. at 780. Under the second test, wetlands were "adjacent to" waters of the United States, and thus within the CWA, if they, "either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'" Ibid. In U.S. v. Donovan, the Third Circuit held "the CWA is applicable to wetlands that meet either the test laid out by the plurality or by Justice Kennedy in Rapanos." 661 F.3d. 174, 184 (3rd Cir. 2011).

While Rapanos addressed the adjacency of wetlands to surface waters, it is instructive in this case, where the consent judgment did not define the term. Here, under either test, the site's groundwater is not adjacent to the Passaic River, Newark Bay, Arthur Kill, or Kill Van Kull. It is groundwater, not surface

13

water, and therefore it cannot have "a continuous surface connection" to the enumerated bodies of water.

Under the concurring test, nothing in this record supports a conclusion the groundwater "significantly affect[ed] the chemical, physical, and biological integrity of other covered waters." While the first action brought by the DEP included contamination of surface waters, the instant complaint is for the site's groundwater, not its impact on other bodies of water.

Additionally, the plain meaning of "adjacent" does not support the trial court's finding. Black's Law Dictionary defines "adjacent" as "[l]ying near or close to, but not necessarily touching." Black's Law Dictionary 50 (11th ed. 2019). Utilizing this definition, the site's groundwater is not adjacent to any of the enumerated bodies of water.

We also reject defendants' contention that any water within the Lower Passaic River Study area is part of the Newark Bay Complex because it was part of the EPA's investigation. This interpretation of the consent judgment renders the requirement of adjacency obsolete and meaningless, and we are reluctant to construe contract terms in such a manner. See Cumberland Cnty. Imp. Auth., 358 N.J. Super. at 497.

We are also unpersuaded by defendants' argument that the groundwater is part of the Newark Bay Complex because it is hydrologically connected to the Saddle River. Defendants theorize that because the groundwater is "plainly adjacent to the Saddle River," which is part of the Newark Bay Complex, and the Saddle River flows into the Lower Passaic River, establishing a hydrological connection between the three waterbodies, they are all adjacent. This contention is an overbroad reading of the specific term of the consent judgment. The Saddle River was part of the EPA's investigation and was adjacent to the Passaic River, which makes the Saddle River part of the Newark Bay Complex. However, the site's groundwater's adjacency to the Saddle River does not, under the confines of the consent judgment, render it part of the Newark Bay Complex.

The second issue is whether the site's groundwater was "investigated for remediation as part of the Diamond Alkali Superfund Process," which refers to

> all investigations and/or response actions (including without limitation removal actions and remedial actions) undertaken in respect to the Diamond Alkali Superfund Site . . . that address or respond to any Discharge of Hazardous Substances that are located or come to be located within the Diamond Alkali Superfund Site (regardless of the location of the source of such Discharge whether inside or outside the Newark Bay Complex).

15

The "Diamond Alkali Superfund Site" was the "geographic area consisting of all operable units or areas identified for investigation and/or response actions . . . by [the EPA], the [DEP], or any other agencies and departments of the State of New Jersey as part of the Diamond Alkali Superfund Process" and such areas include, among others, "the Lower Passaic River Study Area." The "Lower Passaic River Study Area" was "the lower [seventeen] miles of the Passaic River and its tributaries, from the confluence with [the] Newark Bay to the Dundee Dam, . . . and as may be expanded by [the EPA]."

The parties disputed whether the EPA had investigated the site's groundwater, reasserting the arguments they advanced before the trial court. In support of their respective positions, both parties submitted documents regarding the EPA's involvement with the area. The DEP provided the EPA's 2016 and 2021 records of decision, which do not indicate the site's groundwater was part of the Diamond Alkali Superfund Process. The DEP pointed out the EPA's modeling "suggest[ed] that groundwater discharge [was] not a significant source of contamination," and therefore the EPA did not expect it "to be [a] major contaminant source[] to the [Lower Passaic River]." The DEP argued these statements showed the EPA declined to investigate groundwater.

A-1189-22

Defendants countered that, under the plain language of the contract, the EPA investigated the site groundwater because it was part of the areal extent of the contamination and watershed area. Defendants argued the term watershed includes groundwater, which in turn means the EPA investigated the site's groundwater.

Whether the EPA investigated the site's groundwater was a factual issue in dispute that should not have been resolved on motion. The documentation referred to by both parties is not dispositive of the issue, as it does not squarely answer the question and is subject to interpretation. Accordingly, the factual question of the scope of the EPA's investigation should not have been resolved at this early stage, where "plaintiffs are entitled to every reasonable inference of fact." Printing Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 746 (1989) (citation omitted).

Reversed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1189-22